# 12-0497-bk

## United States Court of Appeals
### for the
## Second Circuit

IN RE: GENERAL GROWTH PROPERTIES, INC.



GENERAL GROWTH PROPERTIES, INC., AKA GGP - TOWN EAST MALL, INC.,
AKA GGP MEZZANINE TWO L.L.C., AKA BIRCHWOOD MALL, INC., AKA GGP
FINANCE SUB, INC., AKA COASTLAND CENTER, INC., AKA GGP, AKA GENERAL
GROWTH BAYBROOK MALL, INC., AKA GGP - KENTUCKY, INC., AKA
OAKWOOD HILLS MALL, INC., AKA MALL OF THE BLUFFS, INC., AKA
GGP KAPIOLANI DEVELOPMENT INC., AKA SPRING HILL MALL, INC., AKA
PIERRE BOSSIER MALL, INC., AKA GGP ALA MOANA, INC., AKA GENERAL
GROWTH FINANCE SPE, INC.,

*Debtor-Appellant,*

– v. –

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GENERAL GROWTH
PROPERTIES, INC., *ET AL.*, NEW YORK STATE COMPTROLLER, as Trustee of
the Common Retirement Fund,

*Creditors-Appellees,*

UNITED STATES TRUSTEE,

*Trustee.*

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR APPELLANT

GARY T. HOLTZER
ADAM P. STROCHAK
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Reorganized Debtor-Appellant*
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

## RULE 26.1 CORPORATE DISCLOSURE

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, GGP Limited Partnership states that it is owned as follows:  (i) 1% by its general partner, General Growth Properties, Inc., (ii) 1% by outside common and preferred limited partners, and (iii) 98% by limited partner GGP Limited Partnership II, which owns common and preferred shares of GGP Limited Partnership.  GGP Limited Partnership is a subsidiary of General Growth Properties, Inc., a publicly held corporation.

Dated: New York, New York
    May 18, 2012

                                     *s/ Gary T. Holtzer*

                                     WEIL, GOTSHAL & MANGES LLP
                                     767 Fifth Avenue
                                     New York, New York 10153
                                     Telephone: (212) 310-8000
                                     Facsimile: (212) 310-8007
                                     Gary T. Holtzer
                                     Adam P. Strochak

                                     *Attorneys for Appellant*
                                     *GGP Limited Partnership*

# TABLE OF CONTENTS

Preliminary Statement ...................................................................... 1

Jurisdictional Statement ................................................................... 8

Issues Presented .............................................................................. 9

Statement of the Case ...................................................................... 9

Statement of Facts ......................................................................... 11

I.     GGP LP and the Homart Note ............................................... 11

II.    The GGP LP Plan ................................................................ 12

Summary of the Argument .............................................................. 13

Standard of Review ........................................................................ 15

Argument ...................................................................................... 16

I.     The Decision Below Violates the Bankruptcy Code Provisions for Determining the Amount of an Allowed Claim ........................................... 16

       A.    Postpetition Interest Is Payable Only If There Is an Enforceable Right to It Under the Contract or Applicable Law ............................ 16

       B.    Sections 541(c)(1)(B) and 363(*l*) Render the *Ipso Facto* Clause in the Homart Note Unenforceable ...................................... 20

II.    The Bankruptcy Court Misapplied This Court's Holding in *Ruskin v. Griffiths* ........................................................................... 31

III.   The Bankruptcy Court Misapplied Bankruptcy Code Sections 1123 and 1124 in Requiring Payment of Default-Rate Interest To Cure and Reinstate NYSCRF's Claim. ........................................ 35

Conclusion .................................................................................... 43

Certificate of Compliance .............................................................. 44

i

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Abbott Bank Thedford v. Hanna (In re Hanna)*,
  912 F.2d 945 (8th Cir. 1990) ...............................................26

*Am. Solar King Corp.*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988)................................39

*Bank of Marin v. England*,
  385 U.S. 99 (1966)................................................................29

*Bell v. Bell (In re Bell)*,
  225 F.3d 203 (2d Cir. 2000) ...............................................25

*Bensusan v. Prebul (In re Prebul)*,
  Nos. 08-14010, 08-1139, 2011 WL 2947045
  (Bankr. E.D. Tenn. Jul. 19, 2011).......................................27

*Brunner v. N.Y. State Higher Educ. Servs. Corp.*,
  831 F.2d 395 (2d Cir. 1987) ...............................................16

*Chartschlaa v. Nationwide Mut. Ins. Co.*,
  538 F.3d 116 (2d Cir. 2008) ...............................................21

*Comm'r v. Clark*,
  489 U.S. 726 (1989)...............................................................25

*Cutler v. Cutler (In re Cutler)*,
  165 B.R. 275 (Bankr. D. Ariz. 1994)..................................26

*DB Structured Prods. Inc. v. Am. Home Mortg. Holdings, Inc.*
  *(In re Am. Home Mortg. Ltd.)*,
  402 B.R. 87 (Bankr. D. Del. 2009)......................................27

*Duncan v. Dixie Mgmt. & Inv. (In re Dixie Mgmt. and Investment, L.P.)*,
  Nos. 5:08-bk-73874, 5:10-ap-7184, 2011 WL 1753971
  (Bankr. W.D. Ark. May 9, 2011)...............................23, 26

*Grubb v. Pittsburgh Nat'l Bank (In re Grubb)*,
  169 B.R. 341 (Bankr. W.D. Pa. 1994).................................19

*In re 139-141 Owners Corp.*,
  313 B.R. 364 (S.D.N.Y. 2004) ...........................................................................34

*In re 785 Partners LLC*,
  No. 11-13702, 2012 WL 1154282 (Bankr. S.D.N.Y. Apr. 9, 2012) .................32

*In re Air Vermont, Inc.*,
  47 B.R. 540 (Bankr. D. Vt. 1985)........................................................................42

*In re Airlift Internat'l, Inc.*,
  26 B.R. 61 (Bankr. S.D. Fla. 1982) ....................................................................42

*In re Benalcazar*,
  283 B.R. 514 (Bankr. N.D. Ill. 2002) .................................................................32

*In re Bernard L. Madoff Inv. Secs. LLC*,
  654 F.3d 229 (2d Cir. 2011) ...............................................................................15

*In re Brentwood Outpatient Ltd.*,
  134 B.R. 267 (Bankr. M.D. Tenn. 1991).............................................................19

*In re Charter Commc'ns, Inc.*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009).................................................................40

*In re Daughtery Constr., Inc.*,
  188 B.R. 607 (Bankr. D. Neb. 1995)...................................................................27

*In re Friese*,
  103 B.R. 90 (Bankr. S.D.N.Y. 1989)...................................................................39

*In re Gaslight Village, Inc.*,
  6 B.R. 871 (Bankr. D. Conn. 1980) ....................................................................26

*In re Gray*,
  174 B.R. 228 (Bankr. E.D. Ky. 1994) .................................................................19

*In re Hooker Investments, Inc.*,
  145 B.R. 138 (Bankr. S.D.N.Y. 1992).................................................................33

*In re Merco Joint Venture LLC*,
  No. 02-80588-288, 2002 WL 32063450 (Bankr. E.D.N.Y. 2002).....................42

*In re Mirant Corp.*,
  No. 03-46590, 2005 WL 6440372 (Bankr. N.D. Tex. 2005) ............................41

*In re Moody Nat'l SHS Houston H, LLC*,
  426 B.R. 667 (Bankr. S.D. Tex. 2010) ..............................................................41

*In re Olympia Holding Corp.*,
  68 F.3d 1304 (11th Cir. 1995) ...........................................................................22

*In re Payless Cashways, Inc.*,
  287 B.R. 482 (Bankr. W.D. Mo. 2002) ..............................................................34

*In re Phoenix Business Park L.P.*,
  257 B.R. 517 (Bankr. D. Ariz. 2001)..................................................................41

*In re Texaco Inc.*,
  73 B.R. 960 (Bankr. S.D.N.Y. 1987) ...........................................................19, 28

*In re Turner*,
  157 B.R. 904 (Bankr. N.D. Ala. 1993) ...............................................................19

*In re W.R. Grace & Co.*,
  Nos. 11-199, 11-207, 11-208, 09-644, 09-807, 2012 WL 310815
  (D. Del. Jan. 30, 2012)................................................................................30, 31

*In re Zamani*,
  390 B.R. 680 (Bankr. N.D. Cal. 2008) ...............................................................41

*Key Bank Nat'l Ass'n v. Milham (In re Milham)*,
  141 F.3d 420 (2d Cir. 1998) ..............................................................................16

*L.R.S.C. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*,
  209 F.3d 291 (3d Cir. 2000) .................................................................................1

*Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd.
  (In re Lehman Bros. Holdings Inc.)*,
  422 B.R. 407 (Bankr. S.D.N.Y. 2010)................................................................21

*LTV Corp. v. Aetna Cas. & Sur. Co (In re Chateaugay Corp.)*,
  116 B.R. 887 (Bankr. S.D.N.Y. 1990)................................................................21

*Momentum Mfg. Corp. v. Employee Creditors Comm'r*
   (*In re Momentum Mfg. Corp.*),
   25 F.3d 1132 (2d Cir. 1994) ............................................................16

*Official Comm. of Unsecured Creditors v. Dow Corning Corp.*
   (*In re Dow Corning Corp.*),
   456 F.3d 668 (6th Cir. 2006) ......................................................34, 35

*Patterson v. McLean Credit Union*,
   491 U.S. 164 (1989)........................................................................32

*Patterson v. Shumate*,
   504 U.S. 753 (1992)........................................................................20

*Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*,
   676 F.3d 45 (2d Cir. 2012) ..............................................................15

*Rose v. Gen. Motors Acceptance Corp. (In re Rose)*,
   21 B.R. 272 (Bankr. D.N.J. 1982) ....................................................26

*Ruskin v. Griffiths*,
   269 F.2d 827 (2d Cir. 1959) .....................................................*passim*

*Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*,
   324 F.3d 197 (3d Cir. 2003) ............................................................39

*Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*,
   160 F.3d 1054 (5th Cir. 1998) ....................................................34, 35

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*,
   484 U.S. 365 (1988)........................................................................29

*United States v. LTV Corp. (In re Chateaugay Corp.)*,
   944 F.2d 997 (2d Cir. 1991) ............................................................18

*United States v. Smith*,
   499 U.S. 160 (1991)........................................................................25

STATUTES

11 U.S.C. § 101(5) ...............................................................................18

11 U.S.C. § 362 ...............................................................................28, 32

11 U.S.C. § 363 ...............................................................................*passim*

11 U.S.C. § 363(b) ...........................................................................27, 28

11 U.S.C. § 363(b)(1) ......................................................................29

11 U.S.C. § 363(*l*) ..........................................................................*passim*

11 U.S.C. § 365 ...............................................................................*passim*

11 U.S.C. § 365(b)(2) ......................................................................36, 39, 41

11 U.S.C. § 365(e)(1) ......................................................................20

11 U.S.C. § 502 ...............................................................................5, 14, 17

11 U.S.C. § 502(b) ...........................................................................5, 18

11 U.S.C. § 502(b)(6) ......................................................................39

11 U.S.C. § 506(b) ...........................................................................*passim*

11 U.S.C. § 510(b) ...........................................................................39

11 U.S.C. § 521(d) ...........................................................................25

11 U.S.C. § 541 ...............................................................................*passim*

11 U.S.C. § 541(a)(1) ......................................................................21

11 U.S.C. § 541(c)(1)(B) .................................................................*passim*

11 U.S.C. § 555 ...............................................................................25

11 U.S.C. § 556 ...............................................................................25

11 U.S.C. § 559 ...............................................................................25

11 U.S.C. § 560 ...............................................................................25

11 U.S.C. § 561 ........................................................................25

11 U.S.C. § 1110 ...............................................................30, 42

11 U.S.C. § 1123 ...................................................................7, 42

11 U.S.C. § 1123(d) ..............................................................7, 42

11 U.S.C. § 1124 ..............................................................*passim*

11 U.S.C. § 1124(2) ................................................6, 38, 39, 40

11 U.S.C. § 1124(2)(A) ...............................................................41

11 U.S.C. § 1126(f) ....................................................................35

11 U.S.C. § 1168 ...............................................................30, 42

11 U.S.C. § 1168(a)(2)(B) .........................................................41

28 U.S.C. § 157(b) .......................................................................8

28 U.S.C. § 158(d)(2)(A) ............................................................8

## OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977)......................................................18

S. Rep. 96-989 (1978) ................................................................18

2A N. Singer, Sutherland on Statutes and Statutory Construction
  § 46:06, 194 (6th ed. 2000)..................................................20

3 Collier on Bankruptcy 363.10[2]
  (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006) ......................23

## PRELIMINARY STATEMENT

The Bankruptcy Court's decision announces a new rule regarding postpetition interest that violates express prohibitions in the Bankruptcy Code, rests on a misreading of this Court's precedent, and is at odds with fundamental bankruptcy policies. Specifically, the Bankruptcy Court determined that a debtor can be required to pay postpetition interest at a heightened "default" rate based solely on an "*ipso facto* clause"—a contractual provision that purports to take effect automatically upon the filing of a bankruptcy case.[1] The Bankruptcy Code, however, expressly prohibits enforcement of such clauses when they deprive the debtor of contractual rights that are property of the estate, *see* 11 U.S.C. §§ 541, 363,[2] and that prohibition is not limited to executory contracts, as the Bankruptcy Court erroneously concluded. SPA-11 – SPA-12. By crafting a rule that deprives debtors of their right to use, or exercise rights under, *non*-executory contracts, the Bankruptcy Court violated section 363 of the Bankruptcy Code and defeated the safe haven that Congress intended chapter 11 to provide to debtors such as GGP

---

[1] Contractual provisions that purport to take effect upon the filing of a bankruptcy case are commonly referred to as "*ipso facto*" clauses. *See, e.g.*, *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000).

[2] The relevant text of sections 541 and 363 can be found at SPA-30 and SPA-22, respectively.

Limited Partnership ("GGP LP"), which sought refuge in bankruptcy while it took the steps necessary to reorganize for the benefit of creditors and shareholders alike.

With over 700 other subsidiaries and affiliates, GGP LP is one of the largest shopping center mall operators in the United States.   On April 16, 2009 (the "Petition Date"), in the midst of the deepest economic downturn since the Great Depression, GGP LP, General Growth Properties, Inc. ("GGP"), and several hundred of their subsidiaries (together, "General Growth") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   The bankruptcy filing was necessitated by General Growth's inability to refinance billions of dollars in maturing debt due to the collapse of the market for commercial mortgage-backed securities and the near total freeze of the commercial credit markets.   A-5 (Bankr. Dkt. #12 ¶¶ 10–12).

The breathing spell of chapter 11 allowed General Growth the time to achieve a comprehensive financial restructuring as the economy and credit markets slowly recovered.   The protection of chapter 11 facilitated a successful outcome for creditors of General Growth, all of whom recovered the full value of their claims, as well as for shareholders, who retained approximately a third of the equity in the reorganized company.   A-1683 – A-1695.

Among GGP LP's creditors was Appellee, the Comptroller of the State of New York, as trustee of the Common Retirement Fund ("NYSCRF"), which

2

loaned $254 million in principal amount under a certain promissory note (together with a pledge and security agreement and other related documents, the "Homart Note") that forms the subject of this appeal.  GGP LP proposed, and the Bankruptcy Court confirmed, a plan of reorganization that provided for the reinstatement of the maturity of the Homart Note post-bankruptcy.  Under the plan, GGP LP paid NYSCRF $25,298,014.34 on account of its allowed claim for accrued postpetition interest at the parties' regular contract rate and professional fees.

Appellee disputed the amount of GGP LP's cure payment, contending that it was entitled to postpetition interest at a higher "default" rate (three percent higher than the regular contract rate)—a difference of approximately $11.5 million.  A-1495.  The Bankruptcy Court agreed and ordered GGP LP to pay default-rate interest, SPA-16, without identifying a trigger that would require payment of default-rate interest other than the *ipso facto* provision of the Homart Note that automatically accelerates the loan upon commencement of a bankruptcy.  SPA-1.

The foundation of the Bankruptcy Court's analysis is its erroneous conclusion that the *ipso facto* clause in the Homart Note should be given effect because "*ipso facto clauses* are unenforceable under certain circumstances not applicable here [and] such clauses are not *per se* invalid in the Second Circuit except where contained in an executory contract or unexpired lease."  SPA-13.

Whether the Homart Note is an executory contract—meaning performance is still due from both parties to the contract—is not relevant to determining whether GGP LP must pay default-rate interest. A debtor's entitlement to enforce its rights and obligations under both executory and non-executory contracts during a bankruptcy case, like GGP LP's right and obligation to pay non-default rate interest, is confirmed in section 363's power to use assets of the estate, not in section 365.[3]

Indeed, in sections 363(*l*) and 541(c), Congress expressly protected GGP LP's right to enforce the terms of the Homart Note by invalidating *ipso facto* clauses that interfere with a debtor's use of property of the estate during a bankruptcy case. 11 U.S.C. §§ 363(*l*), 541(c)(1)(B). In confining the invalidation of *ipso facto* clauses solely to executory contracts and unexpired leases, the Bankruptcy Court's decision denied GGP LP the most fundamental grant of authority to a debtor under section 363: the right to use its property, and specifically to exercise rights under a contract, without an *ipso facto* clause's effect.

The Bankruptcy Court compounded its error in ruling that the *ipso facto* clause in the Homart Note was enforceable when it applied that ruling in its analysis under section 506(b).[4] The threshold inquiry in calculating postpetition

---

[3] The relevant statutory text of section 365 can be found at SPA-25.

[4] The statutory text of section 506 can be found at SPA-29.

interest under section 506(b) is whether an oversecured creditor is entitled to—or under the Bankruptcy Code has an "allowed claim" for—default-rate interest in accordance with enforceable provisions of its contract or under state law.  Any entitlement to default interest must exist "as of the date of the filing of the petition" because that is the statutorily prescribed time as of which allowed claims are determined.  11 U.S.C. § 502(b).[5]

The Bankruptcy Court erred in concluding that the *ipso facto* clause was enforceable to accelerate the loan and trigger default interest under the Homart Note at the moment of, and solely because of, the bankruptcy filing.  Because sections 363(*l*) and 541(c)(1)(B) prohibit enforcement of the *ipso facto* clause, Appellee had no enforceable entitlement to, or allowed claim for, to default-rate interest as of the filing of the petition.  Accordingly, sections 502(b) and 506(b) of the Bankruptcy Code prohibited the Bankruptcy Court from awarding anything more than the non-default rate of interest in the parties' agreement.  Confining the invalidation of *ipso facto* clauses solely to executory contracts and unexpired leases also caused the Bankruptcy Court to deviate from the most basic tenet of statutory construction:  a statute must be read as a whole, giving effect to *all* of its parts.

---

[5] The relevant statutory text of section 502 can be found at SPA-27.

Similarly, the Bankruptcy Court's error in ruling that the *ipso facto* clause was enforceable led it to misapply this Court's decision in *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959). SPA-6 – SPA-7. The creditor in *Ruskin* accelerated the loan in accordance with the parties' agreement and did not seek postpetition interest at the default rate based on an *ipso facto* clause, as Appellee does here. Because the creditor in *Ruskin* had an enforceable contractual entitlement to default interest, equitable factors such as solvency came into play only in evaluating whether to adjust that entitlement *downward*. Equitable factors are irrelevant, however, when no enforceable entitlement to default-rate interest exists in the first place, as is the case here.

Finally, the Bankruptcy Court misapplied section 1124(2),[6] failing to recognize that it only sets forth the kinds of treatment necessary to render a claim unimpaired and leaves for the claims allowance provisions of the Bankruptcy Code the task of determining the amount of the allowed claim. Importantly, the Bankruptcy Court also disregarded the express provision in section 1124(2)(A), which excuses debtors from any obligation to cure *ipso facto* defaults. GGP LP paid the full amount of NYSCRF's allowed claim arising from the Homart Note on the effective date of its plan and was not required to pay the default-rate interest under section 1124(2) as any claim to default-rate interest arose solely because of

---

[6] The text of section 1124 can be found at SPA-27.

GGP LP's bankruptcy filing. Having incorrectly concluded that GGP LP was obligated to cure the *ipso facto* default under the Homart Note, the Bankruptcy Court mistakenly applied section 1123(d),[7] which on its face only applies to determine the amount of a claim from a default proposed to be cured under a plan. Because GGP LP was not required to cure the *ipso facto* default that forms the basis for NYSCRF's claim for default-rate interest, its plan did not propose to cure that default, rendering section 1123(d) inapplicable.

The Bankruptcy Court's decision violates clear statutory provisions that implement the rehabilitative goals of the Bankruptcy Code. Bankruptcy protects all constituents—secured creditors, unsecured creditors, and shareholders—by allowing the debtor an opportunity to preserve and maximize value for the benefit of whatever constituency may be entitled to receive it under the priority rules governing distributions. In this case, the refuge of chapter 11, and the debt restructuring and recapitalization it permitted, preserved the jobs of thousands of employees at approximately 200 shopping malls in 43 states, avoided severe economic disruption to General Growth's retail tenants, vendors of goods and services, state and local jurisdictions dependent on sales and real estate taxes, mall patrons, and many others, and preserved and enhanced the value of the business for the benefit of all of General Growth's constituents.

---

[7] The relevant text of section 1123 can be found at SPA-32.

Enforcement of *ipso facto* clauses, by contrast, not only violates the Bankruptcy Code but defeats the policy implemented by the law. It permits oversecured creditors to contract around key bankruptcy protections, effectively imposing a default interest toll payable by the estate for no reason except that the debtor sought shelter in bankruptcy from the perfect storm now called the Great Recession. The Court should reverse the judgment and hold that Appellee is entitled to postpetition interest solely at the non-default contract rate in the parties' agreement.

### JURISDICTIONAL STATEMENT

The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") had jurisdiction under 28 U.S.C. §§ 157(b) and 1334(b). The Bankruptcy Court entered a final order on June 23, 2011. Appellant GGP LP filed a timely notice of appeal on July 5, 2011. SPA-18. The parties jointly requested certification of a direct appeal to this Court, and the Bankruptcy Court certified the appeal. A-916 (Bankr. Dkt. # 7053). GGP LP filed a petition for direct appeal to this Court on August 5, 2011, which this Court granted by order dated February 7, 2012. Dkt. #4. This Court has jurisdiction under 28 U.S.C. § 158(d)(2)(A).

8

## ISSUES PRESENTED

1.      Does the Bankruptcy Code prohibit an award of postpetition interest to a secured lender at a heightened, contractual "default" rate when the sole trigger for the default rate is the debtor's bankruptcy filing?

2.      Do sections 1124(2) and 1123(d) of the Bankruptcy Code require a chapter 11 debtor to pay an oversecured creditor postpetition interest at the contractual default rate when the loan is cured and reinstated under a plan of reorganization and the sole default asserted under the loan agreement is the fact that the debtor filed for chapter 11 protection?

## STATEMENT OF THE CASE

Appellant GGP LP proposed a chapter 11 plan of reorganization that cured the NYSCRF's claims by making a cash payment of $25,298,014.34 for amounts owed, including postpetition interest at the non-default rate and professionals' fees, and reinstated the maturity of the Homart Note (as defined below).  A-1339, A-1814.  Appellee asserted that postpetition interest was payable at the higher default interest rate under the Homart Note.  GGP LP contended that the regular contract rate was applicable because the loan had not been accelerated pre-bankruptcy, so no requirement to pay default interest under the Homart Note had been triggered before the Petition Date.  The parties agreed to defer the interest rate dispute until after confirmation of GGP LP's plan of reorganization.  The Honorable Allan L.

9

Gropper, United States Bankruptcy Judge, confirmed the plan by order dated October 21, 2010.  A-1599.

On October 7, 2010, Appellee filed an objection to GGP LP's cure amount. A-1495.  The parties stipulated to all the material facts, briefed the interest rate dispute, and argued the matter at a hearing on February 24, 2011.  A-1817.  It was undisputed that Appellant was not in default under the Homart Note prior to the Petition Date.  A-1813.

On June 16, 2011, the Bankruptcy Court issued a memorandum opinion granting Appellee's objection (the "Memorandum Opinion").  SPA-1.  The Memorandum Opinion is reported at *In re General Growth Properties, Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011).  The Memorandum Opinion concluded that Article 3(F) of the Homart Note provided for an automatic acceleration of the loan upon commencement of a voluntary bankruptcy case, triggering default-rate interest (a three-percent increase over the regular non-default rate).  The Bankruptcy Court held that Congress did not expressly invalidate *ipso facto* clauses such as the one contained in Article 3(F), and the provision, therefore, was enforceable in the absence of countervailing equitable factors, such as impairment of the debtor's fresh start.  SPA-13 – SPA-14.  Finding the automatic acceleration under the *ipso facto* clause enforceable, the Bankruptcy Court concluded that there was a rebuttable presumption against modification of private contractual

10

arrangements imposing default-rate interest in cases involving a solvent debtor. SPA-10 – SPA-11. On June 23, 2011, the Bankruptcy Court entered an order requiring GGP LP to pay Appellee postpetition interest at the default rate. SPA-16.

An unpublished companion opinion was entered by the Bankruptcy Court in another default interest rate dispute between debtor GGP (an affiliate of GGP LP) and the lenders under a credit facility of approximately $2.6 billion (the "2006 Loan"). The 2006 Loan opinion is reported at *In re General Growth Properties, Inc.*, No. 09-11977, 2011 WL 2974305 (Bankr. S.D.N.Y. July 20, 2011). This Court granted a petition for direct appeal of the 2006 Loan opinion and ordered that it be heard in tandem with this appeal. *See* Order, *Gen. Growth Props., Inc. v. Eurohypo AG (In re Gen. Growth Props., Inc.)*, No. 12-501 (Dkt. #3).

## STATEMENT OF FACTS

## I.    GGP LP AND THE HOMART NOTE

The parties stipulated to all material facts and the terms and conditions of the loan documents are a matter of record. On February 8, 2008, GGP LP executed the Homart Note pursuant to which it agreed to repay NYSCRF $254 million in principal amount with a fixed maturity date of February 28, 2013. The Homart Note was secured by a pledge of GGP LP's equity interest in a joint venture. A-1812 – A-1813.

11

Article 3 of the Homart Note identifies "Events of Default" and states in Article 3(F) that an event of default occurs if GGP LP "commence[s] a voluntary case under any applicable bankruptcy, insolvency or other similar law."  A-942. Article 3 of the Homart Note further provides that upon an event of default in Article 3(F), "the unpaid principal amount of [the Homart Note], together with accrued and unpaid interest, shall become immediately due and payable without any declaration or other act on the part of [NYSCRF]."  A-942; A-1813.  In addition, Article 4 of the Homart Note states that upon any event of default and during the continuance of the same, GGP LP shall pay interest on the unpaid principal of the Homart Note at a rate three percent higher than the non-default rate, totaling 8.95% per annum (the "Default Rate").  A-942; A-1813.

## II.    THE GGP LP PLAN

On October 21, 2010, the Bankruptcy Court confirmed the *Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as Modified* relating to certain of the General Growth entities, including GGP LP (the "GGP LP Plan").  A-1599.  The GGP LP Plan became effective under its terms on November 9, 2010 (the "Effective Date").  A-816 (Bankr. Dkt. # 6332).

Section 4.13 of the GGP LP Plan provided for the cure of NYSCRF's claims and reinstatement of the maturity of the Homart Note under section 1124 of the

Bankruptcy Code, treating NYSCRF's claim as unimpaired.[8]   A-1690.   On the Effective Date, in accordance with the terms of the GGP LP Plan, GGP LP paid NYSCRF $25,298,014.34, representing cure payments consisting of accrued interest at the contractual non-default rate for the period of March 1, 2009 to November 9, 2010, and professional fees.   A-1814.   In addition to the above amounts paid under the GGP LP Plan, by this appeal, NYSCRF seeks postpetition interest at the Default Rate, from the Petition Date, in the amount of approximately $11.5 million.  A-1814.

### SUMMARY OF THE ARGUMENT

The Bankruptcy Court's decision to award NYSCRF postpetition interest at the Default Rate should be reversed because it violates express prohibitions in the Bankruptcy Code and is premised on a fundamental misunderstanding of the framework specified by the Bankruptcy Code for calculating postpetition interest. As the Bankruptcy Court recognized, section 506(b) of the Bankruptcy Code enables a creditor whose allowed claim is oversecured to receive postpetition interest.   Section 506, however, does not specify the applicable interest rate. Instead, it refers to the parties' agreement and requires the applicable contractual

---

[8] Section 1124 of the Bankruptcy Code sets forth the requirements for treating claims under a plan as unimpaired, such that the claimant is deemed to accept the plan.

rate of interest to be determined as of the petition date, like all other claims, in accordance with section 502 of the Bankruptcy Code.

The Bankruptcy Court erred in awarding postpetition interest at the heightened Default Rate based solely on an *ipso facto* clause providing that GGP LP's filing for bankruptcy protection is an event of default that triggered the Default Rate. The Bankruptcy Code expressly prohibits enforcement of the *ipso facto* clause (*see* 11 U.S.C. §§ 363(*l*), 541(c)(1)(B)) negating any basis for concluding that the Default Rate was in effect as of the Petition Date and could be used to calculate postpetition interest under section 506(b). The Bankruptcy Court's contrary conclusion that *ipso facto* clauses are unenforceable only in the context of executory contracts or unexpired leases cannot be reconciled with the plain language of the Bankruptcy Code or the Congressional policy goals that the Bankruptcy Code reflects.

Nor does *Ruskin v. Griffiths* authorize an award of postpetition interest at the Default Rate under the terms of the Homart Note and the stipulated facts below. *Ruskin* addressed whether equitable principles required that the Court reduce an otherwise enforceable claim for default interest triggered by an actual contract-based acceleration of the loan—not solely, as here, by an *ipso facto* clause and the debtor's mere act of filing for bankruptcy protection. Far from supporting the decision below, *Ruskin* wholly supports the legal principle that any entitlement to

14

receive postpetition interest at the default rate from a debtor requires that the creditor's claim to default interest be enforceable—or under the Bankruptcy Code's terminology an "allowed" claim—in the first instance. NYSCRF had no allowed claim for default interest as of the Petition Date and therefore was entitled to an allowed claim for postpetition interest solely at the non-default contract rate.

The Bankruptcy Court likewise erred by failing to properly apply section 1124 in awarding default-rate interest to NYSCRF without first analyzing the amount of NYSCRF's allowed claims under sections 506(b), 502, 363(*l*), and 541(c). Because NYSCRF does not have an allowed claim for default-rate interest, payment of interest at the Default Rate was not required to cure and reinstate the maturity of the Homart Note under the plain meaning of section 1124(2)(A). Rather, the Bankruptcy Court awarded interest at the Default Rate based on what it considered to be the equities of the case, in contravention of the Bankruptcy Code and relevant caselaw.

No basis exists to award postpetition interest at the Default Rate, and this Court should reverse the judgment of the Bankruptcy Court.

## STANDARD OF REVIEW

The legal conclusions, including statutory interpretations, of the Bankruptcy Court are subject to *de novo* review. *Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45 (2d Cir. 2012); *In re Bernard L. Madoff Inv.*

15

*Secs. LLC*, 654 F.3d 229 (2d Cir. 2011). The Bankruptcy Court's findings of fact are evaluated under a clearly erroneous standard. *Momentum Mfg. Corp. v. Employee Creditors Comm'r (In re Momentum Mfg. Corp.)*, 25 F.3d 1132 (2d Cir. 1994). But this Court is not required to accept the Bankruptcy Court's conclusions as to the legal effect of findings of fact. *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).

**ARGUMENT**

**I.    THE DECISION BELOW VIOLATES THE BANKRUPTCY CODE PROVISIONS FOR DETERMINING THE AMOUNT OF AN ALLOWED CLAIM.**

**A.    Postpetition Interest Is Payable Only If There Is an Enforceable Right to It Under the Contract or Applicable Law.**

The only disputed portion of NYSCRF's claim is its request for postpetition interest at the Default Rate that NYSCRF alleges is required to cure an *ipso facto* default for the purposes of the reinstatement of the maturity of the Homart Note under the GGP LLP Plan. Section 506(b) permits an oversecured creditor to recover postpetition, pendency interest in accordance with the agreement under which the claim arose.[9] Specifically, the statute provides that:

---

[9] *See Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 422–23 (2d Cir. 1998) ("Directly or by implication, the Bankruptcy Code provides for three categories of interest: (1) interest accrued prior to the filing of the bankruptcy petition (prepetition interest); (2) interest accrued after the filing of a petition but prior to the effective date of a reorganization plan (pendency interest); and (3) interest to accrue under the terms of a reorganization plan (plan interest).") (citations omitted).

[t]o the extent that an *allowed secured claim* is [oversecured], there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b) (emphasis added).  The use of the term "allowed secured claim" in section 506(b) is critical—to receive interest at a default rate, a creditor must be legally entitled to it under the agreement under which such claim arose.

The starting point for determining the amount of NYSCRF's "allowed secured claim" is section 502 of the Bankruptcy Code, titled "Allowance of claims or interests."  Section 502(b)(1) states that a claim shall be allowed unless the "claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."[10]  The Bankruptcy Code, by operation of law, quantifies

---

[10] As applicable here, section 502 states:

(a)    A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects.

(b)    [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1)    such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502.

claims as of the date of the filing of the bankruptcy petition.[11]  The effect of these provisions is to accelerate unmatured indebtedness for the purpose of quantifying an *allowed claim*.  This automatic acceleration of the principal by operation of the Bankruptcy Code for purposes of claims allowance, however, is not applicable to trigger *contractual* consequences of the acceleration.[12]  Here, although a claim for the full principal amount of the Homart Note is considered due on the Petition Date in order to determine the amount of the allowed claim in the bankruptcy case, the mere acceleration for claims allowance purposes is not the same as an acceleration

---

[11]  *See* 11 U.S.C. § 502(b) ("[T]he court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition.).  The reason for this is to afford the broadest possible relief to the debtor to treat and discharge claims, *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1003–04 (2d Cir. 1991), and in that vein, the Bankruptcy Code broadly defines what constitutes a claim.  11 U.S.C. §101(5) ("The term 'claim' means (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment.").

[12]  *See* H.R. Rep. No. 95-595, at 352–354 (1977); S. Rep. 96-989, at 62–65 (1978) ("[B]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor.  One unarticulated reason for this is that the discounting factor for claims after the commencement of the case is equivalent to contractual interest rate on the claim.  Thus this paragraph does not cause disallowance of claims that have not been discounted to a present value because of the irrebuttable presumption that the discounting rate and the contractual interest rate (even a zero interest rate) are equivalent.").

18

of the loan under the terms of the Homart Note.[13]  In other words, the acceleration that occurs in quantifying the claim is insufficient to trigger additional contractual obligations between the parties.  Instead, such contractual obligations must be determined solely with regard to the underlying agreement itself and the effect of the applicable provisions of the Bankruptcy Code thereon.

Thus, NYSCRF's allowed secured claim is determined by reference to its rights under the Homart Note as of the Petition Date—except to the extent that its claim under that agreement is unenforceable under applicable law, including under the Bankruptcy Code.[14]  The Bankruptcy Code itself—the most applicable law in

---

[13] *See In re Texaco Inc.*, 73 B.R. 960, 965, 968 (Bankr. S.D.N.Y. 1987) (refusing to modify the automatic stay to allow the indenture trustee to serve notice of acceleration under an indenture to begin the running of default-rate interest, even though for purposes of determining the amount of its *claim*, the bankruptcy filing had the effect of accelerating the debt, stating "[t]he Note holders seek more than a preservation of their rights. Although there is presently no default in payment under the Indenture, the Note holders propose to use the debtors' commencement of these Chapter 11 cases as a reason for effecting an acceleration of the indebtedness, not by operation of law, but by contractual conduct authorized under the Indenture because of the commencement of the Chapter 11 cases").

[14] The term "applicable law" as used in section 502(b)(1) includes the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.  *See In re Brentwood Outpatient Ltd.*, 134 B.R. 267, 269 (Bankr. M.D. Tenn. 1991), *aff'd*, 152 B.R. 727 (M.D. Tenn. 1993), *rev'd on other grounds*, 43 F.3d 256 (6th Cir. 1994) (stating that "applicable law" for purposes of section 502(b)(1) includes bankruptcy law); *see also Grubb v. Pittsburgh Nat'l Bank (In re Grubb)*, 169 B.R. 341, 347 (Bankr. W.D. Pa. 1994) ("applicable law" includes bankruptcy rules and local rules); *In re Gray*, 174 B.R. 228, 230 (Bankr. E.D. Ky. 1994) ("applicable law" includes bankruptcy rules); *In re Turner*, 157 B.R. 904, 911 (Bankr. N.D. Ala. 1993) ("applicable law" includes bankruptcy rules).  Moreover, where the Bankruptcy

19

this instance—explicitly provides that the *ipso facto* trigger that forms the basis of NYSCRF's claim for interest at the Default Rate is not enforceable against GGP LP. *See infra* Part I.B. Accordingly, interest at the Default Rate is not part of NYSCRF's allowed secured claim.

**B.     Sections 541(c)(1)(B) and 363(*l*) Render the *Ipso Facto* Clause in the Homart Note Unenforceable.**

The Bankruptcy Court based its decision on section 365 of the Bankruptcy Code and the erroneous premise that "whether a bankruptcy default clause should be treated as an invalid *ipso facto* clause depends on whether the contract at issue is an executory contract or unexpired lease." A-1894 – A-1895 (citing 11 U.S.C. § 365(e)(1)). This conclusion is incorrect as a matter of law. The Bankruptcy Code *does* invalidate *ipso facto* clauses in non-executory contracts such as the Homart Note pursuant to a different provision, section 363(*l*). "Property of the estate," as broadly defined in section 541, includes contracts that a debtor is permitted to use pursuant to section 363. When section 363(*l*) is applied to

Code uses the term "applicable nonbankruptcy law," this includes "any relevant nonbankruptcy law." *Patterson v. Shumate*, 504 U.S. 753, 758–59 (1992). Thus, the term "applicable law" must include *any* law, including bankruptcy law, as different terms carry different meanings and "Congress knows how to restrict the scope of 'applicable law'" when it "desire[s] to do so." *Id.*; *see also* 2A N. Singer, Sutherland on Statutes and Statutory Construction § 46:06, 194 (6th ed. 2000) (where Congress uses different terms within a statute, different meanings are intended).

determine the allowed amount of a claim under sections 502 and 506(b), as it must be, the Bankruptcy Court's decision cannot stand.

Section 541 of the Bankruptcy Code determines GGP LP's property interests as of the Petition Date, specifying that the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Homart Note (as well as GGP LP's rights thereunder) became part of GGP LP's bankruptcy estate upon the commencement of its bankruptcy case. This Court has interpreted section 541(a) broadly to include a debtor's contract rights, such as those afforded to GGP LP under Homart Note.[15] Section 541(c)(1)(B) in turn provides that "an interest of the debtor in property becomes property of the estate . . . notwithstanding" an *ipso facto* or bankruptcy clause and the effects of such clause.[16]

---

[15] *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) ("It would be hard to imagine language that would be more encompassing than [section 541(a)'s] broad definition . . . . Contractual rights clearly fall within the reach of this section.") (citations omitted); *see also LTV Corp. v. Aetna Cas. & Sur. Co (In re Chateaugay Corp.)*, 116 B.R. 887, 898 (Bankr. S.D.N.Y. 1990) (holding that bonding agreements are contractual rights that constitute intangible property and are thus included within the debtor's estate).

[16] Bankruptcy courts have explained that section 541(c)(1)(B) invalidates *ipso facto* clauses for the purpose of determining what is "property of the estate." *See, e.g.*, *Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407, 419 (Bankr. S.D.N.Y. 2010) (citing section 541(c)(1)(B) to invalidate *ipso facto* provisions in derivatives contracts that would impermissibly alter the distribution scheme in the Bankruptcy Code and thereby modify the debtor's property rights solely because of its bankruptcy filing).

21

Section 363 of the Bankruptcy Code works in tandem with section 541 and protects a debtor's right to the use, sale, and lease of property once it becomes part of a debtor's estate.  *See, e.g., In re Olympia Holding Corp.*, 68 F.3d 1304, 1307 (11th Cir. 1995) (citing sections 541(c)(1)(B) and 363(*l*) and holding that a provision of the Negotiated Rates Act of 1993 was not an impermissible *ipso facto* clause because it was not conditioned on the financial condition of the debtor).  These provisions of the Bankruptcy Code, when read together, reflect that a debtor is empowered under sections 363(b) and (c) to "use" property of the estate, which includes the debtor's ability to enforce its rights under both executory and non-executory contracts during a bankruptcy case.  Specifically, section 363(*l*) provides that a debtor may use its property, including under a chapter 11 plan, "notwithstanding any provision in a contract"—including an *ipso facto* clause—that effects "a forfeiture, modification, or termination of the debtor's interest in such property."[17]  The treatment of NYSCRF's claim under the GGP LP Plan

---

[17] Section 363(*l*) states:

> Subject to the provisions of section 365, the trustee may use, sell, or lease property . . . or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, [or] on the commencement of a case under this title concerning the debtor, . . . and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

22

enforces GGP LP's entitlement to "use" its contractual rights under section 363(*l*), including GGP LP's entitlement to pay interest at the contractual non-default rate.

Thus, section 541(c)(1)(B) prohibits enforcement of an *ipso facto* clause that effects a forfeiture, modification, or termination of the debtor's interest in property, including contract rights, as to property coming into a debtor's estate, and section 363(*l*) performs the same function for purposes of the debtor's authority to use its property once it becomes part of the debtor's estate.[18]    The property and contractual rights at issue here necessarily include GGP LP's right to pay interest at the non-default rate, absent acceleration under the Homart Note by reason other than an *ipso facto* provision.  As such, sections 363(*l*) and 541(c)(1)(B) expressly invalidate *ipso facto* clauses in non-executory contracts, like the Homart Note.

---

11 U.S.C.  § 363(*l*).

[18] *See Duncan v. Dixie Mgmt. & Inv. (In re Dixie Mgmt. and Inv., L.P.)*, Nos. 5:08-bk-73874, 5:10-ap-7184, 2011 WL 1753971, at *2 (Bankr. W.D. Ark. May 9, 2011) (rendering ineffective an *ipso facto* provision that would force the removal of a member of an LLC because "[u]nder § 541(c)(1), Dixie's membership . . . constitutes property of the estate, despite the conflicting [*ipso facto*] provision" and "under § 363(*l*), Dixie is permitted the use and benefit of its interest in the LLC and has the right to continue as a member of the LLC"); 3 Collier on Bankruptcy 363.10[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006) ("In effect, section 541 governs what comes into the estate, but section 363 . . . governs the property once it is in the estate.  In this regard, bankruptcy law protects the trustee's ability . . . to use the property in a reorganization, but it does not override restrictions on the transfer or use of the property that are not tied to the debtor's bankruptcy or its financial condition.").

23

NYSCRF does not dispute that Article 3(F) of the Homart Note is a provision that is conditioned on the commencement of a bankruptcy case.[19]  And the plain language of Article 4 of the Homart Note, if triggered, unequivocally results in a modification of GGP LP's rights under the Homart Note to pay the non-default rate of interest unless and until the loan is accelerated under the terms of the agreement.  A-1813.[20]  As set forth *supra* Part I.A, the Bankruptcy Code provides NYSCRF with a *claim* against GGP LP, not an acceleration of the loan under the terms of the Homart Note.  The Homart Note never accelerated as a result of the bankruptcy filing.  All NYSCRF was entitled to receive was a *claim* against GGP LP under section 506(b)—a *claim* that was already paid in full, in cash on the Effective Date of GGP LP's Plan under the terms thereof.

The modification of GGP LP's rights under the Homart Note that converts the interest rate to the Default Rate upon a bankruptcy filing is precisely the

_____

[19] The parties stipulated that "[a]s of the Petition Date, the Homart Note was not in default.  Article 3 of the Homart Note, provides that the commencement of a bankruptcy case by GGP LP constitutes an immediate event of default.  Article 3 of the Homart Note further provides that if the default is a result of a bankruptcy filing 'the unpaid principal amount of the Promissory Note, together with accrued and unpaid interest, shall become immediately due and payable without any declaration or any act on the part of Payee.'" A-1813.  Article 3(F) of the Homart Note applies if GGP LP "commence[s] a voluntary case under any applicable bankruptcy, insolvency or other similar law." A-941 – A-942.

[20] Article 4 of the Homart Note provides that upon or during the continuance of an event of default, including an event of default under Article 3(F), NYSCRF is entitled to interest at the Default Rate. A-942.

forfeiture, modification, or termination of GGP LP's interest in property that sections 363(*l*) and 541(c)(1)(B), together, prevent—alteration of a debtor's property rights, including its contract rights, solely by virtue of a bankruptcy filing. GGP LP has a property interest in its bargained-for interest rate under the Homart Note. Sections 541(c)(1)(B) and 363(*l*) of the Bankruptcy Code apply in this case to permit GGP LP to enforce its rights under the Homart Note during the pendency of its bankruptcy and in connection with its plan of reorganization without regard to, or application of, the *ipso facto* provision.[21] NYSCRF is entitled to postpetition

---

[21] Congress specifically carved out certain narrow exceptions to its general invalidation of *ipso facto* clauses in the Bankruptcy Code, allowing for their enforcement in safe-harbor contracts, consumer debtor issues, and other limited circumstances. *See, e.g.*, 11 U.S.C. § 555 (expressly enforcing *ipso facto* provisions in securities contracts); 11 U.S.C. § 556 (expressly enforcing *ipso facto* provisions in commodities and forward contracts); 11 U.S.C. § 559 (expressly enforcing *ipso facto* provisions in repurchase agreements); 11 U.S.C. § 560 (expressly enforcing *ipso facto* provisions in swap agreements); 11 U.S.C. § 561 (expressly enforcing *ipso facto* provisions in master netting agreements and generally in safe-harbor contracts in chapter 15 proceedings); and 11 U.S.C. § 521(d) (expressly enforcing *ipso facto* provisions under certain circumstances in certain lease and secured credit agreements of consumer debtors). As this Court has held, "[w]here Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied . . . ." *Bell v. Bell (In re Bell)*, 225 F.3d 203, 214 n.15 (2d Cir. 2000) (citing *United States v. Smith*, 499 U.S. 160, 167 (1991); *Comm'r v. Clark*, 489 U.S. 726, 739 (1989) (holding that where "a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision") (internal quotation marks and citation omitted)). It is thus improper as a matter of statutory construction to create additional exceptions to a statute that explicitly lists its own exceptions; yet this is precisely what the Bankruptcy Court did. Congress clearly knew how and where to limit its broad prohibition on *ipso facto* clauses, and the Bankruptcy Court had no authority to interject additional exceptions.

interest under section 506(b) only under "the agreement . . . under which such claim arose." 11 U.S.C. §506(b). NYSCRF's claim arose under the Homart Note as it existed in GGP LP's bankruptcy estate—as shaped by sections 541(c)(1)(B) and 363(*l*)—*i.e.*, without any application of the *ipso facto* clause in Article 3(F) of the Homart Note.

Numerous bankruptcy court decisions have recognized that sections 541(c)(1)(B) and 363(*l*) operate to invalidate *ipso facto* clauses generally, even when the underlying contract is non-executory.[22] These cases include instances where a court denied effect to an *ipso facto* clause that modified or terminated a debtor's right to maintain a membership interest in a limited liability corporation or partnership,[23] to avoid dissolution of an entity,[24] and to protect the debtor's rights under a non-executory mortgage servicing contract.[25]

---

[22] *See generally Rose v. Gen. Motors Acceptance Corp. (In re Rose)*, 21 B.R. 272, 276 (Bankr. D.N.J. 1982) (citing sections 363(*l*) and 541(c)(1)(B) to state that "there is simply no reason to assume that Congress intended to make [*ipso facto*] clauses enforceable only in non-executory contracts"); *see also Abbott Bank Thedford v. Hanna (In re Hanna)*, 912 F.2d 945, 951 n.8 (8th Cir. 1990) ("[Section] 363(*l*) is directed solely at making so-called *ipso facto* or bankruptcy-default clauses unenforceable."); *In re Gaslight Village, Inc.*, 6 B.R. 871, 875 (Bankr. D. Conn. 1980) (Sections "363 and 541 expressly denounce so-called *ipso facto* clauses which terminate the debtor's interest in the property.").

[23] *In re Dixie Mgmt. and Inv., L.P.*, 2011 WL 1753971, at *2 (rendering ineffective an *ipso facto* provision that would force the removal of a member of an LLC because the debtor is "permitted the use and benefit of its interest in the LLC and has the right to continue as a member of the LLC"); *Cutler v. Cutler (In re Cutler)*, 165 B.R. 275, 278–79 (Bankr. D. Ariz. 1994) (reading sections 541(c)(1)(B) and

Section 363(*l*) of the Bankruptcy Code thus gives a debtor the ability to use its contract rights, either executory or non-executory, in a chapter 11 case without suffering the effect of an *ipso facto* provision in the contract. For example, if a debtor had a prepetition executory contract with a vendor to supply the debtor a product over a period of time, but the agreement included a provision that the contract terminated upon a bankruptcy filing (an *ipso facto* termination), the debtor nonetheless would be able to enforce its right under that supply agreement, relying on section 363(b) and 363(*l*). In a non-executory contract context, the result is the same. If a vendor agreed to ship a product one time under a contract that provides for thirty-day payment terms, but the agreement included a provision that the price increased by three percent if the purchaser filed for bankruptcy, that purchaser, if it

---

363(*l*) together to invalidate an *ipso facto* clause that triggered a buyout provision upon the debtor's bankruptcy).

[24] *Bensusan v. Prebul (In re Prebul)*, Nos. 08-14010, 08-1139, 2011 WL 2947045, at *10–11 (Bankr. E.D. Tenn. Jul. 19, 2011) (using sections 541(c)(1)(B) and 363(*l*) to invalidate an *ipso facto* provision triggering dissolution of an LLC); *In re Daughtery Constr., Inc.*, 188 B.R. 607, 612–13 (Bankr. D. Neb. 1995) (finding that the debtor was permitted the use and benefit of its membership interest in certain limited liability companies and that any dissolution of the entities triggered by the chapter 11 filing of a member conflicts with section 363 and is unenforceable).

[25] *DB Structured Prods. Inc. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Ltd.)*, 402 B.R. 87, 99 (Bankr. D. Del. 2009) ("[T]he admitted purpose of the Indemnity Provision was to serve as an early warning of the Debtors' financial condition and to permit [the counterparty] to seize valuable servicing rights . . . [and] it would elevate form over substance not to include these provisions within the fold of *ipso facto* provisions invalidated by § 363(*l*).").

27

filed for bankruptcy after receiving the product, would also be entitled to enforce its contractual right to pay for the product without the three-percent increase, also relying on sections 363(b) and 363(*l*). The Homart Note is no different. The foregoing hypothetical involves a purchase of a product, and the Homart Note involved a purchase of money.

That a debtor may use, sell, or lease property under section 363(b) of the Bankruptcy Code and prohibit interference with those rights under the automatic stay provisions of section 362,[26] applies whether the contract is executory or not. Indeed, a debtor seeking to compel a non-debtor party to comply with a contract, whether executory or non-executory, during a bankruptcy case, relies on the grant of authority in section 363 to use property of the estate; nothing in section 365 protects a debtor's interest in that regard. Whether a contract is executory, a debtor's rights and its use of those rights under a contract are preserved under section 363(*l*), and by its plain terms, section 363(*l*) provides that the debtor's rights under that contract are to be determined without giving effect to *ipso facto* provisions. *See In re Texaco Inc.*, 73 B.R. at 968 ("Congress specifically rejected *ipso facto* clauses geared to the commencement of title 11 cases not only with respect to executory contracts, but also with respect to the concept of what constitutes property of the estate, as expressed in 11 U.S.C. § 541(c)(1)(B), and

---

[26] The relevant statutory text of section 362 can be found at SPA-20.

28

with respect to a debtor's right to use, sell, or lease property as reflected in 11 U.S.C. § 363(b)(1).").

Nothing in section 365 negates the rights afforded under section 363(*l*).[27] The first clause of section 363(*l*) states that it is "subject to the provisions of section 365," 11 U.S.C. § 363(*l*), but that means only that section 363(*l*) was not intended to supersede all the rules that Congress included in the Bankruptcy Code for executory contracts and unexpired leases, which receive special treatment under the Bankruptcy Code because performance is still due from both parties. Nothing in the Bankruptcy Code suggests that, if the property of the estate in question is a contract that is not executory, then a bankruptcy court can simply ignore the general protections afforded to all of a debtor's property under section 363(*l*).  To hold otherwise would gut the protections of section 363(*l*) that facilitate the rehabilitation of financially distressed individuals and businesses, making certain property of the estate—specifically, rights under non-executory contracts—

---

[27] As the Supreme Court has instructed, bankruptcy laws cannot be read "with the ease of a computer."  *Bank of Marin v. England*, 385 U.S. 99, 103 (1966).  Rather, the Supreme Court has emphasized that a "holistic" approach should be used when interpreting the Bankruptcy Code.  *United Sav. Ass'n v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 371 (1988).

vulnerable to contractual termination or modification triggered solely by a bankruptcy filing.[28]

It is unsurprising, therefore, that the most recent decision disallowing a claim for default-rate interest based solely on an *ipso facto* clause involves a non-executory loan agreement and presents facts squarely analogous to those at issue here. *See In re W.R. Grace & Co.,* Nos. 11-199, 11-207, 11-208, 09-644, 09-807, 2012 WL 310815 (D. Del. Jan. 30, 2012), *appeal docketed*, No. 12-11521 (3d Cir. Mar. 5, 2012). In that long-running chapter 11 case, the debtor objected to a claim for postpetition default interest from unsecured bondholders who, like NYSCRF here, were left unimpaired under the debtor's chapter 11 plan.[29] The non-executory nature of the loan agreement was immaterial to the *W.R. Grace* court, which stated that the lack of an entitlement to default-rate interest effectively ends

---

[28] Indeed, like the specific invalidation of *ipso facto* clauses in executory contracts and unexpired leases in section 365, other sections of the Bankruptcy Code invalidate *ipso facto* clauses in other specific circumstances. *See, e.g.*, 11 U.S.C. § 1110 (precluding certain financiers and lessors of aircraft equipment from taking possession of collateral to enforce rights and remedies if a debtor, after 60 days after the chapter 11 filing agrees to perform under the loan or lease and cures defaults, other than *ipso facto* defaults); 11 U.S.C. § 1168 (protecting financiers of rolling stock equipment but invalidating *ipso facto* provisions).

[29] Whether a request for postpetition default-rate interest is made by a secured creditor pursuant to section 506(b) or by an unsecured creditor does not change the analysis as to whether the claim is allowed in the first place. In each instance, the creditor must establish that it has an allowable claim for postpetition default-rate interest before the court may conduct any further analysis on the request.

the inquiry. *Id*. at *75. In support of its holding that the lenders could not premise W.R. Grace's default on the *ipso facto* clause in its credit agreements, the *W.R. Grace* court stated that it "agree[d] with the general trend of the federal courts that the prohibition against *ipso facto* clauses is not limited to actions based upon §§ 541(c) and 365(e)"—*i.e.*, not limited to executory contracts. *Id*. at *70.

The Bankruptcy Court's contrary holding in this case—that *ipso facto* clauses are unenforceable solely in executory contracts and unexpired leases—directly contradicts the plain language of the Bankruptcy Code and frustrates its rehabilitative goals. Because sections 363(*l*) and 541(c)(1)(B) prohibit enforcement of the *ipso facto* clause that triggered the Default Rate here, this Court must reverse the Bankruptcy Court's decision to award postpetition Default Rate interest to NYSCRF.

## II. THE BANKRUPTCY COURT MISAPPLIED THIS COURT'S HOLDING IN *RUSKIN V. GRIFFITHS*.

The Bankruptcy Court misapplied this Court's holding in *Ruskin v. Griffiths* in determining that *Ruskin* mandated payment of postpetition interest to NYSCRF. In *Ruskin,* before this Court analyzed equitable factors, including the debtor's solvency, it first examined whether the lender was contractually entitled to default interest. Only upon finding that the lender was contractually entitled to default

31

interest did this Court examine whether the default rate should have been *reduced* due to equitable considerations (such as solvency of the debtor).[30]

In *Ruskin*, the terms of the lender's secured notes permitted it to give notice accelerating its debt and thereby collect default-rate interest if the borrower filed for bankruptcy. *Id.* at 829–30. The borrower sought bankruptcy protection but the lender did not provide the notice required to trigger the default rate until approximately ten months after the petition date. *Id.* at 830. The agreement in *Ruskin* provided that, for the default rate of interest to be effective, the lender had to provide notice to the debtor of the event of default.[31] *Id.* at 829. Only after

---

[30] *In re 785 Partners LLC*, No. 11-13702, 2012 WL 1154282 (Bankr. S.D.N.Y. Apr. 9, 2012) is a recent case applying the *Ruskin* two-step analysis. Specifically, the United States Bankruptcy Court for the Southern District of New York, citing *Ruskin*, first established the lenders' entitlement to default-rate interest on the loan *before* citing to the Bankruptcy Court's decision in the present case to analyze whether equitable circumstances warrant a rate reduction. *785 Partners*, 2012 WL 1154282, at *2, *5–6.

[31] Because *Ruskin* was decided under the former Bankruptcy Act, the lender was able to provide notice of acceleration after the petition date. *Id.* at 830. Today, the automatic stay set forth in section 362 of the Bankruptcy Code would prevent a creditor from unilaterally taking actions to accelerate a note following the filing of a bankruptcy case. The automatic stay did not exist under the Bankruptcy Act to prevent the lender from giving a notice of acceleration of the debt after the bankruptcy filing. *See, e.g.*, *In re Benalcazar*, 283 B.R. 514, 520–21 (Bankr. N.D. Ill. 2002) ("When the Bankruptcy Code was adopted in 1978, a generally applicable automatic stay was, for the first time, made part of the statute itself."). Although cases decided under the prior Bankruptcy Act may generally be relied upon, they remain good law only to the extent the law did not change substantively, *i.e.*, where the case remains relevant under the current Bankruptcy Code. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989)

32

establishing that the lender had properly triggered the default rate did this Court weigh equitable considerations to determine that the accrual of default-rate interest was appropriate because, among other things, the debtor was solvent. *Id*. at 829–30, 832. Therefore, this Court allowed the lender postpetition default-rate interest only for the period after the notice was given and postpetition non-default-rate interest for the period from the commencement of the bankruptcy case until notice of acceleration was given. *Id*. at 835.

*Ruskin* thus fully supports the proposition that solvency is not a factor to be considered until an entitlement to default-rate interest is triggered in accordance with the underlying documents and applicable law. Here, the Bankruptcy Court's reliance on *Ruskin* is premised on its erroneous conclusion that the *ipso facto* provision of the Homart Note was an appropriate trigger for default-rate interest. Correct application of the analytical framework of *Ruskin* requires the conclusion that NYSCRF is not entitled to default-rate interest because there was no enforceable acceleration of the loan triggering a contractual requirement to pay the higher default rate. *See supra* Part I.

---

(concluding reliance on prior caselaw is not justified where there is "intervening development of the law, through either the growth of judicial doctrine or further action taken by Congress" or "[w]here such changes have removed or weakened the conceptual underpinnings from the prior decision"); *see also In re Hooker Invs., Inc.*, 145 B.R. 138, 147 (Bankr. S.D.N.Y. 1992) (holding that precedent interpreting the Bankruptcy Act "must and can be reconsidered in light of the changes in the governing law" brought about in the Bankruptcy Code).

Numerous decisions from other circuits and lower courts nationwide have applied this same analysis, considering solvency only when the lender had triggered the contractual entitlement to default-rate interest prepetition. *See, e.g.*, *Southland Corp. v. Toronto-Dominion* (*In re Southland Corp.*), 160 F.3d 1054, 1057–58 (5th Cir. 1998) (establishing that the creditor had, pre-filing, validly triggered the default rate in its agreement, before examining the equities of the case); *In re 139-141 Owners Corp.*, 313 B.R. 364 (S.D.N.Y. 2004) (finding that the creditor had validly triggered the default rate pre-filing); *In re Payless Cashways, Inc.*, 287 B.R. 482, 485–88 (Bankr. W.D. Mo. 2002) (examining at length whether the default rate had been validly triggered pre-filing, and on which portion of the debt the default rate applied under the contract, before examining the equities of the case).

The Bankruptcy Court cited the Sixth Circuit's opinion in *Official Committee of Unsecured Creditors v. Dow Corning Corporation* (*In re Dow Corning Corporation*), 456 F.3d 668 (6th Cir. 2006), which purported to identify a "general rule calling for the payment of default interest in solvent debtor cases" and remanded to the district court to consider any equitable factors affecting the interest rate. *Id.* at 680. Unlike *Ruskin* and *Southland*, however, *Dow* did not discuss whether the default rate was properly instituted pre-filing or whether imposition of the default rate was premised on an unenforceable *ipso facto*

34

provision. The supposed "general rule" in *Dow* likewise ignores the statutory analysis that dictates whether a default rate is proper in the first instance regardless of equitable factors. As *Ruskin* and *Southland* demonstrate, equitable factors come into play solely to determine whether to ratchet down a contractual entitlement to default interest, not as an independent basis to ratchet up the applicable rate and award default interest. To the extent *Dow* advances a "general rule" requiring default interest merely because a debtor is solvent, that rule cannot be squared with *Ruskin*, which controls here as circuit precedent, or with *Southland*.

## III. THE BANKRUPTCY COURT MISAPPLIED BANKRUPTCY CODE SECTIONS 1123 AND 1124 IN REQUIRING PAYMENT OF DEFAULT-RATE INTEREST TO CURE AND REINSTATE NYSCRF'S CLAIM.

The Bankruptcy Court erroneously determined that GGP LP was required to pay postpetition interest at the Default Rate in order to "cure" and reinstate NYSCRF's claim and thereby render the claim "unimpaired" under GGP LP's Plan. *See* 11 U.S.C. § 1124 (setting forth requirements for treating a claim as unimpaired). Under the Bankruptcy Code, holders of unimpaired claims are deemed to have accepted a debtor's plan of reorganization and, thus, are not entitled to vote on the plan. *See id.* § 1126(f).[32] Significantly, section 1124

---

[32] The GGP LP Plan provided that NYSCRF's claim was unimpaired and, thus, NYSCRF was deemed to have accepted the GGP LP Plan. A-1690.

addresses impairment of *claims*, not impairment of contracts or creditors.[33]

Accordingly, impairment analysis under section 1124 for a chapter 11 plan of

---

[33] Section 1124 provides:

> Except as provided in section 1123 (a)(4) of this title, a class of *claims* or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
>
> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or
>
> (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
>
> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365 (b)(2) of this title or of a kind that section 365 (b)(2) expressly does not require to be cured;
>
> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>
> (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365 (b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

reorganization must begin with a determination of the *allowed* amount of the *claim*, a critical step that the Bankruptcy Court failed to properly execute.

In determining that the amount paid to NYSCRF pursuant to the GGP LP Plan was insufficient to render NYSCRF's claim unimpaired—because it included postpetition interest only at the *non*-default rate, SPA-7 – SPA-8—the Bankruptcy Court compounded the same fundamental error underlying its analysis under section 506. *See supra* Part I. As previously established, a proper analysis of sections 506(b), 502, 363(*l*), and 541(c) of the Bankruptcy Code yields the inescapable result that NYSCRF's allowed claim under the Bankruptcy Code does *not* include default-rate interest because the *ipso facto* clause was insufficient to trigger that obligation. *See id.* Because NYSCRF had no allowed claim for default-rate interest, GGP LP was not required to pay such interest to cure NYSCRF's claim under the GGP LP Plan. Further, because GGP LP was not required to cure the *ipso facto* default under section 1124(2)(A), section 1123(d)—which governs the amount necessary to cure a default under a plan—is inapplicable.

---

(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124 (emphasis added).

Misreading *Ruskin*, the Bankruptcy Court assumed that NYSCRF's allowed claim included interest at the Default Rate simply because GGP LP was solvent:

> In any event, the instant matter falls squarely within the reasoning of *Ruskin v. Griffith* [sic] and its progeny. *Ruskin* calls for the payment of default interest by a solvent debtor to effect the cure and reinstatement of a debt, absent factors that would make such payment inequitable.

SPA-8. *Ruskin*, however, does not authorize consideration of solvency as a substitute for determining whether default-rate interest is included in an allowed claim. To the contrary, as previously discussed, *Ruskin* considered solvency as an equitable factor for potentially ratcheting down an entitlement to default-rate interest properly included in an allowed claim. *See supra* Part II. Rather than analyze section 1124 in light of the proper *allowed claim* of NYSCRF, the Bankruptcy Court skipped that first step and jumped, impermissibly, to its view of the equities of the case (*i.e.*, solvency of the debtor), awarding default-rate interest in a manner contrary to the Bankruptcy Code and controlling law.

On the Effective Date of its chapter 11 plan, GGP LP cured the outstanding defaults under the Homart Note by paying the accrued amounts then due under the NYSCRF claim, as allowable under the Bankruptcy Code, reinstated the maturity of the Homart Note and otherwise left unaltered the legal, equitable, and contractual rights to which NYSCRF was entitled in respect of its claim. 11

U.S.C. § 1124(2). Thus, NYSCRF's claim was unimpaired under the GGP LP

Plan pursuant to section 1124(2) of the Bankruptcy Code.[34]

Moreover, the Bankruptcy Court's analysis was flawed not only regarding

its failure to properly determine the amount of NYSCRF's allowed claim, but also

in its disregard for the plain language of section 1124(2)(A)'s cure provision.

Section 1124(2)(A) provides that a debtor is not required to cure "default[s] of a

kind" specified in section 365(b)(2), which are defaults resulting from, among

others, the insolvency or financial condition of the debtor or the bankruptcy filing.

11 U.S.C. §§ 1124(2)(A), 365(b)(2).[35] In other words, section 1124(2)(A)

expressly disclaims any requirement to cure a default related to an *ipso* facto

---

[34] Here, because sections 363(*l*) and 541(c)(1)(B) invalidate the *ipso facto* clause and thus preclude payment of default interest, this "statutory impairment" of the NYSCRF's rights by operation of the Bankruptcy Code does not render them impaired for purposes of section 1124(2). *See, e.g.*, *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197 (3d Cir. 2003) (holding that the rejection damages cap on claims in section 502(b)(6) of the Bankruptcy Code does not result in impairment of a claim under section 1124(1)); *In re Friese*, 103 B.R. 90, 92 (Bankr. S.D.N.Y. 1989) (noting that a plan that proposes to satisfy a tax claim under section 507(a)(8) through deferred cash payments "would appear to be impairment literally embraced by the language of section 1124 since the rights of the taxing authority are being altered," but holding that such treatment does not constitute impairment because section 1129(a)(9)(c) permits it); *Am. Solar King Corp.*, 90 B.R. 808, 819–21 (Bankr. W.D. Tex. 1988) (determining that subordination of claims in section 510(b) of the Bankruptcy Code does not constitute impairment for purposes of section 1124 of the Bankruptcy Code).

[35] Section 365 of the Bankruptcy Code generally addresses the treatment of executory contracts and unexpired leases, and in subsection (b)(2) provides that *ipso facto* clauses are unenforceable in bankruptcy. 11 U.S.C. § 365(b)(2).

clause.  By excepting *ipso facto* defaults from the general requirement that a debtor cure all defaults, section 1124(2)(A) allows for cure in circumstances where a debtor cannot "unring the bell," such as a breach of a financial covenant or the bankruptcy filing itself.  *See In re Charter Commc'ns, Inc.*, 419 B.R. 221, 251 (Bankr. S.D.N.Y. 2009) (finding that the debtors were not obligated to cure certain *ipso facto*-triggered defaults pursuant to a reinstatement of debt under section 1124(2)).[36]  Excepting a debtor from curing an *ipso facto* default is separate from a determination of the allowed claim, and it provides an independent reason why the Bankruptcy Court's cure analysis cannot stand.

The Bankruptcy Court incorrectly determined that GGP LP was not entitled to the benefits of section 1124 because "whether a bankruptcy default clause should be treated as an invalid *ipso facto* clause depends on whether the contract at issue is an executory contract or unexpired lease."  SPA-11 – SPA-12.  Because GGP LP did not assert that the Homart Note was an executory contract, the Bankruptcy Court determined that GGP LP was not excused from having to cure or pay default-rate interest regarding the *ipso facto* default.

---

[36] The Bankruptcy Court failed to consider the exception embodied in section 1124(2)(A), noting instead, "[s]ection 1124 contains several exceptions not relevant to the instant matter."  SPA-7 n.6.  The Bankruptcy Court did not explain why it found that section 1124(2)(A)'s *ipso facto* exception was irrelevant to its analysis.

Nothing in section 1124(2)(A), however, limits its purview to executory contracts.  To the contrary, the express language in section 1124(2)(A) makes clear that its cure exceptions extend beyond section 365(b)(2) to defaults "*of a kind*" referenced in section 365(b)(2)—including, defaults related to *ipso facto* clauses, whether in executory or non-executory contracts.  Unsurprisingly, therefore, courts have applied section 1124(2)(A) to non-executory contracts.  For instance, the United States Bankruptcy Court for the Northern District of Texas applied the *ipso facto* exception in section 1124(2)(A) to the reinstatement of a series of notes, finding that certain defaults in the applicable indenture were "*of the kind* excused by Code §§ 1124(2)(A) and 365(b)(2)(A) – (C) *and therefore need not be addressed.*"  *In re Mirant Corp.*, No. 03-46590, 2005 WL 6440372, at *4 (Bankr. N.D. Tex. 2005) (emphasis added); *see also In re Zamani*, 390 B.R. 680, 685–86 (Bankr. N.D. Cal. 2008) (recognizing that section 1124(2)(A)'s cure exception for "the kinds of" defaults in section 365(b)(2) applies to the reinstatement of a non-executory note and deed of trust); *In re Phoenix Bus. Park L.P.*, 257 B.R. 517, 520–21 (Bankr. D. Ariz. 2001) (same); *but see In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 673 (Bankr. S.D. Tex. 2010). [37]

---

[37] Two other Bankruptcy Code sections support a debtor's ability to avoid an *ipso facto* cure in non-executory contracts under section 1124(2)(A).  Sections 1110 and 1168 permit a debtor to cure its contractual defaults in bankruptcy and, as with section 1124(2)(A), do not require the debtor to cure defaults "of a kind specified in section 365(b)(2)."  11 U.S.C. §§ 1110(a)(2)(B), 1168(a)(2)(B).  Importantly,

Having incorrectly passed over the express exception in section 1124(2)(A) to GGP LP's obligation to cure the *ipso facto* default, the Bankruptcy Court improperly analyzed section 1123(d) of the Bankruptcy Code. Section 1123(d) is not relevant to the present dispute. It applies only to circumstances in which a debtor proposes to cure a default under a plan. *See* 11 U.S.C. § 1123. Because default-rate interest was not properly part of NYSCRF's allowed claim, as discussed in Part II above, it was not proposed to be cured under the GGP LP Plan, rendering section 1123(d) immaterial.

In sum, GGP LP was not required to cure the *ipso facto* default; and, pursuant to the claims allowance process, it was not required to pay default-rate interest on account of such *ipso facto* default. Because neither section 1123 nor section 1124 required GGP LP to pay postpetition interest at the Default Rate to

---

sections 1110 and 1168 apply to both executory *and* non-executory agreements, and it has been noted that the concept of "cure" in these sections exists distinct and apart from that found in section 365. *See In re Merco Joint Venture LLC*, No. 02-80588-288, 2002 WL 32063450, at *3 (Bankr. E.D.N.Y. 2002) (stating that "[a] plain reading of [section 1168] reveals that it does not matter whether the moving party is a lessor or a secured creditor" and noting that "§ 1168 creates an exception to the comprehensive rules governing the universe of 'unexpired leases'" in section 365); *In re Air Vt., Inc.*, 47 B.R. 540 (Bankr. D. Vt. 1985) (applying section 1110 to a non-executory conditional aircraft sales contract); *In re Airlift Internat'l, Inc.*, 26 B.R. 61, 62 (Bankr. S.D. Fla. 1982) ("If the debtor does cure defaults and agrees to perform [under section 1110], that performance and agreement is *not* the assumption of an executory contract or lease, which remains subject to the requirements of 11 U.S.C. § 365."). Thus, section 1110 and 1168 reinforce that a "default of a kind" in section 365 must be read to encompass *ipso facto* clauses in non-executory contracts.

42

treat NYSCRF's claim as unimpaired under the GGP LP Plan, this Court should reverse the Bankruptcy Court's judgment.

### CONCLUSION

For the reasons stated above, this Court should reverse the Bankruptcy Court's decision that NYSCRF is entitled to interest at the Default Rate.

Dated: New York, New York
      May 18, 2012

s/ Gary T. Holtzer
_____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Adam P. Strochak

*Attorneys for Appellant*
*GGP Limited Partnership*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 11,294 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), as counted by Microsoft Word, Office XP, the word processing software used to prepare this brief.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Office XP, Times New Roman, 14 point.

  *s/ Gary T. Holtzer*  
Gary T. Holtzer, Esq.  
*Attorney for Appellant*  
*GGP Limited Partnership*

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Memorandum of Opinion of the Hon. Allan L. Gropper,
Dated June 16, 2011 ............................................................  SPA-1

Order of the Hon. Allan L. Gropper Granting Default Interest
to the Comptroller of the State of New York as Trustee
of the Common Retirement Fund, Dated June 23, 2011,
Appealed From....................................................................  SPA-16

Notice of Appeal, Dated July 5, 2011 ......................................  SPA-18

Relevant Portions of 11 U.S.C.A. § 362. Automatic Stay .......  SPA-20

Relevant Portions of 11 U.S.C.A. § 363. Use, Sale,
or Lease Property ................................................................  SPA-22

Relevant Portions of 11 U.S.C.A. § 365. Executory Contacts
and Unexpired Leases ..........................................................  SPA-25

Relevant Portions of 11 U.S.C.A. § 502. Allowance of Claims
or Interests ..........................................................................  SPA-27

11 U.S.C.A. § 506. Determination of Secured Status ..............  SPA-29

Relevant Portions of 11 U.S.C.A. § 541. Property of
the Estate ............................................................................  SPA-30

Relevant Portions of 11 U.S.C.A. § 1123. Contents of Plan....  SPA-32

11 U.S.C.A. § 1124. Impairment of Claims or Interests ..........  SPA-34

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x

In re:

GENERAL GROWTH PROPERTIES, INC., *et al.*,

                            Reorganized Debtors.

--------------------------------------------------------------------x

Chapter 11

Case No. 09-11977 (ALG)

(Jointly Administered)

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

WEIL, GOTSHAL & MANGES LLP
*Attorneys for the Reorganized Debtors*
767 Fifth Avenue
New York, New York 10153
  By:  Marcia L. Goldstein
        Gary T. Holtzer
        Adam P. Strochak

200 Crescent Court, Suite 300
Dallas, Texas 75201
  By:  Stephen A. Youngman

700 Louisiana Street, Suite 1600
Houston, Texas 77002
  By:  Sylvia A. Maycr

KIRKLAND & ELLIS LLP
*Co-Counsel for the Reorganized Debtors*
300 North LaSalle Street
Chicago, Illinois 60654
  By:  James H.M. Sprayregen
        Anup Sathy

HERRICK, FEINSTEIN LLP
*Attorneys for the Comptroller of the State of New York,*
*as Trustee of the Common Retirement Fund*
2 Park Avenue
New York, NY 10016
  By:  Andrew C. Gold

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

      The Comptroller of the State of New York, as trustee of the Common Retirement Fund ("CRF"), has objected to its treatment under the Reorganized Debtors' Third Amended Joint Plan of Reorganization (the "Plan") (Dkt. No. 6232).[1] Under the Plan, CRF's debt was reinstated. The sole issue is whether CRF is entitled to post-petition interest on its claim at the contract default rate of 8.95% for the period from the filing of the Chapter 11 petition of GGP Limited Partnership ("GGP") through November 9, 2010, the Effective Date. For the reasons set forth hereafter, in this involving a solvent debtor, CRF is entitled to such interest.

## BACKGROUND

      The background facts set forth hereafter are largely taken from a stipulation of facts entered into between GGP and CRF (Dkt. No. 6728) and are not in dispute. On or about February 8, 2008, CRF and GGP entered into a promissory note (the "Homart Note") pursuant to which CRF extended a loan of $254 million to GGP in connection with GGP's purchase of a 50% interest in the "Homart II" joint venture, which is the indirect owner of twelve stand-alone shopping centers or malls. Pursuant to the Homart Note, GGP promised to pay CRF the outstanding principal amount upon maturity and to make quarterly interest payments. The Homart Note matures on February 28, 2013 and is secured by a pledge of GGP's shares in the Homart II joint venture.

      The Homart Note provides that, among other things, the voluntary commencement of a bankruptcy case by GGP constitutes an event of default. *See* Art.

---

[1] The confirmation order (Dkt. No. 6240) was entered on October 21, 2010 and the Plan became effective on November 9, 2010 (the "Effective Date").

2

3(F), Homart Note. In contrast to other events of default in Article 3 of the Homart Note, subsection (F) provides that an event of default premised on the commencement of a voluntary bankruptcy case occurs automatically and without any requirement that CRF "call" the default by providing notice to any party. *See* Art. 3, Homart Note. Upon the occurrence of an event of default, the Homart Note provides that CRF is entitled to a 3% increase in the rate of interest owed on the balance of the unpaid principal for a total interest rate of 8.95% per annum (the "Default Rate"). *See* Art. 4, Homart Note. There is no dispute that the Default Rate, as a standalone figure, is not disproportionately higher than the non-default rate contained in the Homart Note. *See Stipulation of Facts* at ¶ 3.

There is no dispute that prior to April 16, 2009 (the "Petition Date"), the Homart Note was not in default. Pursuant to Art. 3(F) of the Homart Note, GGP's filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 16, 2009 constituted an automatic and immediate event of default. On November 5, 2009, CRF filed its secured proof of claim (the "CRF Claim") in the principal amount of $245,115,000 plus interest at the non-default rate of 5.95% through May 31, 2009 and thereafter at the default rate of 8.95%.[2] The CRF Claim

---

[2] In CRF's objection (the "Objection") to the Plan, dated October 7, 2010 (Dkt. No. 6121), CRF asserts that the CRF Claim is "a secured claim in the principal amount of $245,115,000, plus interest at the non-default rate of 5.95% through May 31, 2009 in the amount of $3,727,109.75 and interest at the default rate of 8.95% from June 1, 2009 through October 30, 2009 in the total amount of $9,262,623.50." *Objection* at ¶ 13. CRF also asserts that "Interest continues to accrue at the rate of $60,938.31 per diem." *Id.* at ¶ 14. In footnote 3 of GGP's Response (Dkt. No. 6529), filed on or about January 10, 2011, GGP suggested that the reference to October 30, 2009 is a "scrivener's error" and that CRF intended to refer to October 30, 2010. Rather than a scrivener's error, it appears that October 30, 2009 was chosen to allow calculation of the amount of default interest then owing prior to filing the CRF Claim. CRF alleges an entitlement to interest at the Default Rate thereafter through the Effective Date at a per diem of $60,938. *Id.* at ¶ 14, 31.

further asserts a claim for fees and expenses, including attorney's fees. Other than as discussed below, GGP has not objected to the CRF Claim.

Pursuant to § 4.13 of the Plan, which was filed on August 27, 2010, GGP proposed to cure the default on the Homart Note by reinstating the principal amount of the debt and paying any outstanding interest due to CRF at the non-default rate of 5.95%. In the Objection, CRF claimed that GGP "(i) incorrectly assumes that payment of CRF's claim at the non-default contract rate is sufficient . . . (ii) does not take into account the fees and expenses incurred by CRF, and (iii) in any event, does not fully pay CRF's claim because CRF is entitled to default interest." *Objection* at ¶ 1. GGP and CRF agreed to defer resolution of the Objection until after GGP's emergence from bankruptcy. On the Effective Date, consistent with § 4.13 of the Plan, GGP reinstated the Homart note and paid CRF $25,298,014.34 in cash to compensate CRF for accrued interest at the non-default rate from March 1, 2009 through the Effective Date and professional fees. Payment of this amount does not reflect payment of any interest at the Default Rate, and it reduced the sum in dispute to approximately $11.5 million.

There is also no dispute that GGP is and was, on the Effective Date, highly solvent. *See Stipulation of Facts* at ¶ 2. Indeed, because of the progress made during the course of the Chapter 11 cases of GGP and its affiliates, the Reorganized Debtors were able to relist their stock on the New York Stock Exchange even before their emergence from bankruptcy, apparently the first debtors to do so. *See Debtor's Disclosure Statement* at Art. III.B.7.[3] GGP and its affiliates emerged from bankruptcy

---

[3] The Disclosure Statement for Plan Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code was filed on August 27, 2010 (Dkt. No. 5865).



as the second largest mall owner in the United States, with 180 malls in 43 states. *Id.* at Art. I.A. They restructured more than $15 billion of secured debt, and more than $7 billion of unsecured creditor claims was paid in full with post-petition interest or reinstated. According to counsel for the Equity Committee, on the Effective Date, GGP and its affiliates distributed approximately $6 billion in value to its shareholders. *See* May 26, 2011, Trial Tr. (statement of John Jerome) (Dkt. No. 6939).

## DISCUSSION

Any consideration of a claim for post-petition interest should start with the statutory predicates. Section 502(b)(2) of the Bankruptcy Code ordinarily disallows post-petition interest, a principle that the Supreme Court has stated is "[t]he general rule in bankruptcy and in equity receivership" because the delay of the case is "a delay necessitated by law if the courts are properly to preserve the estate for the benefit of all interests involved." *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 163-64 (1946). Today this general rule is subject to two exceptions in Chapter 11 cases — one statutory and one court-created. *See* Carmen H. Lonstein and Steven A. Domanowski, *Payment of Post-Petition Interest to Unsecured Creditors: Federal Judgment Rate Versus Contract Rate*, 12 AM. BANKR. INST. L. REV. 421, 423 (Winter, 2004). The statutory exception is set forth in § 506(b) of the Bankruptcy Code, which provides:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose.

5


11 U.S.C. § 506(b). Although § 506(b) provides that an oversecured creditor is entitled to post-petition interest, it does not specify an interest rate. CRF and GGP agree that there is a rebuttable presumption in favor of granting an oversecured creditor interest at the rate specified in the contract, subject to equitable considerations. *See Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998); *Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054 (5th Cir. 1998); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325 (S.D.N.Y. 2008); *In re 139-141 Owners Corp.*, 313 B.R. 364 (S.D.N.Y. 2004); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002); *In re Adejobi*, 404 B.R. 78 (Bankr. E.D.N.Y. 2009).

The court-created exception to the disallowance of post-petition interest is based on the principle that before there is a return to equity in a reorganization case, creditors should receive interest as compensation for the delay of the bankruptcy process. In *Ruskin v. Griffith*, 269 F.2d 827 (2d. Cir 1959), *cert. denied*, 361 U.S. 947 (1960), which remains binding authority even though it arose under the prior Bankruptcy Act,[4] the relevant agreement provided that upon the occurrence of an event of default, including the commencement of a bankruptcy case, noteholders could accelerate the entire unpaid amount of the notes upon notice to the debtor. Such notice was provided by the creditor in *Ruskin*, and the Court required the debtor to pay the default rate of interest, which was 6% rather than 4%, because the debtor was

---

[4] *See Citibank v. Nyland*, 878 F.2d 620, 625 (2d Cir. 1989) (finding that vitality of *Ruskin* remains unimpaired); *see also Urban Communicators PCS Ltd. P'ship*, 394 B.R. at 340 (collecting cases holding that *Ruskin* remains binding in the Second Circuit).

solvent and the Court found that the variable interest provision was not a penalty. The Court also stated that under the facts there, it would have been "the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act." *Id.* at 832.[5]

In the case at bar, CRF's right to receive default interest derives from the Debtors' reinstatement of the loan under § 1124 of the Bankruptcy Code. Section 1124 permits a debtor to reinstate debt in connection with confirmation of a Plan by curing any existing defaults and reinstating the maturity of the debt, without altering the legal, equitable or contractual rights of the debt holder.[6] GGP asserts that cure and reinstatement erases all effects of a default, and that since one effect of a default is the contractual right to interest at the Default Rate, reinstatement and cure wipes out this aspect of default as well. *See Response* at ¶ 20. In support of its proposition, GGP cites several older cases, including *Levy v. Forest Hills Assocs. (In re Forest Hills Assocs.)*, 40 B.R. 410 (Bankr. S.D.N.Y. 1984). *See Response* at ¶ 22; *see also Great Western Bank & Trust v. Entz-White Lumber and Supply, Inc. (Entz-White Lumber and Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988). Other Courts in this district have rejected an expansive reading of § 1124(2). *See In re 139-141 Owners Corp.*, 313 B.R. at 368 ("Section 1124(2) does not provide a statutory basis for judicial

---

[5] The principle that creditors should be paid interest before any return is provided to equity is also reflected in 11 U.S.C. § 726(a)(5), which requires payment of interest to creditors at the legal rate before payment to equity in chapter 7 cases. Section 1129(a)(7), the "best interests test," provides that each creditor in a chapter 11 case must generally receive a distribution at least as large as it would receive in a chapter 7 liquidation, providing a further basis for the requirement that some post-petition interest be paid.

[6] In relevant part, § 1124(2) defines a class of claims as unimpaired under a plan provided that the plan, "notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case . . .;" (B) reinstates the pre-default maturity of such claim; "(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;" and "(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest." Section 1124 contains several exceptions not relevant to the instant matter.

nullification of a contract right to default interest rate."). There is also conflicting authority whether the reasoning of cases such as *Entz-White* survived the 1994 amendment of the Bankruptcy Code, which added § 1123(d).[7] *Compare In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 672 (Bankr. S.D. Tex. 2010) ("to the extent that there was ambiguity as to how to cure a default when *Entz-White* was written, that ambiguity evaporated in 1994 when § 1123(d) was added" to the Bankruptcy Code), *with In re Phoenix Bus. Park Ltd. P'Ship*, 257 B.R. 517, 522 (Bankr. D. Az. 2001) (construing the language of § 365(b)(2) of the Bankruptcy Code, which was adopted at the same time as § 1123(d), together with § 1124(2) and finding that "*Entz-White* remains good law in the Ninth Circuit" because "Congress did not legislatively overrule *Entz-White*" when it enacted § 1123(d)). We need not resolve this apparent conflict, however, because § 1123(d) certainly does not preclude the payment of default interest—under the facts of this case, § 1123(d) points to its payment "in accordance with the underlying agreement and applicable nonbankruptcy law." In any event, the instant matter falls squarely within the reasoning of *Ruskin v. Griffith* and its progeny. *Ruskin* calls for the payment of default interest by a solvent debtor to effect the cure and reinstatement of a debt, absent factors that would make such payment inequitable.

In the instant case, none of the factors typically justifying the nullification of a default rate interest provision are present. GGP has stipulated that, as a stand-alone

---

[7] 11 U.S.C. § 1123(d) provides that :

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

rate, the Default Rate is not a penalty. GGP has not alleged any misconduct by CRF.
Finally, payment of default interest would neither inflict harm on other unsecured
creditors nor impair GGP's fresh start because GGP was exceedingly solvent when it
emerged from bankruptcy. As the Second Circuit said many years ago in *Ruskin v.
Griffiths*, if creditors could not rely on the courts to enforce default interest rate
clauses, creditors would have "to anticipate a possible loss in the value of the loan
due to his debtor's bankruptcy or reorganization, [and a lender] would need to exact a
higher uniform interest rate for the full life of the loan," unnecessarily increasing the
cost of credit for all borrowers. *Ruskin*, 269 F.2d at 832.

GGP also argues that 1123(d) was enacted solely to overrule the Supreme
Court's decision in *Rake v. Wade*, 508 U.S. 464 (1993), which construed § 1322 of
the Bankruptcy Code and held that the statute requires that compound interest be paid
by debtors defaulting on their mortgage, notwithstanding applicable state law. *See
Supplemental Statement* at ¶ 3 (Dkt. No. 6715). GGP suggests that Congress' express
purpose in enacting this section was to ensure that "a cure pursuant to a plan should
operate to put the debtor in the same position as if the default had never occurred."
*Id.*, citing 140 Cong. Rec. H. 10, 770 (Oct 4, 1994); *see also, In re Schatz*, 426 B.R.
24 (Bankr. D.N.H. 2009), which disallowed post-petition default rate interest where
the creditor was also recovering costs and attorneys' fees pursuant to section 506(b).[8]
However, as CRF responds, § 1123(d) is a chapter 11 provision, and the plain terms
of the 1994 amendments to the Bankruptcy Code are far broader than necessary if the

---

[8] It should also be noted that the Court in *In re Phoenix Bus. Park. P'Ship* determined that the
default rate in that case of 24% was a "penalty rate" when compared to the contract rate of 10.75% and
held that "if a default interest rate is a 'penalty rate,' then it does not need to be paid as part of a
section 1124(2) cure." *In re Phoenix Bus. Park Ltd. P'Ship*, 257 B.R. at 521.

amendment's only purpose was to overturn *Rake*, a chapter 13 case. *See* Dean
Pawlowic, *Entitlement to Interest under the Bankruptcy Code*, 12 BANKR. DEV. J.
149, 179-82 (1995); *see, e.g., In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667;
*see also Hepner v. PWP Golden Eagle Tree, LLC (In re K&J Props., Inc.)* 338 B.R.
450, 461 (Bankr. D. Colo. 2005); *see also* 140 Cong. Rec. H. 10, 770.

    The payment of default interest in this matter is also consistent with the
increasing reluctance of courts in this and other circuits, in construing the requirement
of § 506(b) that an oversecured creditor receive "interest," to modify private
contractual arrangements imposing default interest rates except where: (i) there has
been creditor misconduct; (ii) application of the contractual interest rate would cause
harm to the unsecured creditors; (iii) the contractual interest rate constitutes a penalty;
or (iv) its application would impair the debtor's fresh start.[9] *See In re P.G. Realty Co.*,
220 B.R. at 780; *see also In re Vest Assocs.*, 217 B.R. at 702-03 ("The developing
consensus is a presumption in favor of the contract default rate subject to equitable
considerations."). This reluctance is particularly evident in cases where the debtor
proves to be solvent. *See In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006)
(holding that "in solvent debtor cases, rather than considering equitable principles,
courts have generally confined themselves to determining and enforcing whatever
pre-petition rights a given creditor has against the debtor."); *see also In re 139-141
Owners Corp.*, 313 B.R. at 368; *In re Southland Corp.*, 160 F.3d at 1060; *In re
Payless Cashways, Inc.*, 287 B.R. 482, 489 (Bankr. W.D. Mo. 2002); *cf. Matter of*

---

[9] The parties have not stipulated whether CRF is oversecured by virtue of its security interest in the
Homart II joint venture. However, during the course of the GGP Chapter 11 case, the parties only cited
one secured creditor as possibly undersecured, and the collateral there was a mall in Louisiana
adversely affected by Hurricane Katrina.

*Chicago, Milwaukee, St. Paul and Pacific R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) (holding that "if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights").

This Court's decision in *In re Northwest Airlines Corp.*, 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007), cited by GGP, is not to the contrary. In that case, the Court canvassed some of the same authority cited herein relative to the reinstatement and cure of a default of a secured loan under § 1124 of the Bankruptcy Code. *See Id.* at *6. The equitable factors typically used in determining a rate for "interest" under § 506(b) were applied, and the § 506(b) claim for default interest was denied because the notice required to accelerate the debt had never been given, the debtor was insolvent, and payment of interest at the default rate would have come at the expense of the unsecured creditors. *Id.* The reasons supporting the denial of default interest in *Northwest* are not present in the case at bar.

Finally, GGP contends that the Default Rate should not be applied because it was never triggered and did not become applicable. *See Response* at ¶ 27. Although Article 3(F) of the Homart Note provides for the automatic imposition of the Default Rate on the outstanding principal upon the commencement of a bankruptcy case without the need for any further action, GGP asserts that Art. 3(F) is an invalid *ipso facto* clause that should not be given effect because it penalizes GGP for seeking chapter 11 relief. *See Response* at ¶ 1, citing 11 U.S.C. § 365(e)(1).

As a matter of statute, the question whether a bankruptcy default clause should be treated as an invalid *ipso facto* clause depends on whether the contract at

11

issue is an executory contract or unexpired lease. *See* 11 U.S.C. § 365(e)(1).[10] GGP

does not assert that the Homart Note is an executory contract, much less an unexpired

lease, accepting the obvious fact that the only obligation remaining to be performed

by GGP under the Homart Note is repayment and that loan agreements are generally

not considered to be executory contracts. *See NLRB v. Bildisco & Bildisco*, 465 U.S.

513, 523 n.6 (1984) (executory contracts are those "on which performance remains

due to some extent on both sides."); *see In re Calpine,* Case No. 05-60200-BRL, 2008

WL 3154763 at *4 (Bankr. S.D.N.Y. Aug. 4, 2008); *In re Chateaugay Corp.*, 102

B.R. 335, 347 (Bankr. S.D.N.Y. 1989); H.R.Rep. No. 95–595, 95th Cong., 2d Sess.

347, reprinted in 1978 U.S. Code Cong. & Admin. News 6303–04 (a "note is not

usually an executory contract if the only performance that remains is repayment").[11]

GGP nonetheless contends that *ipso facto* clauses are generally disfavored and

should not be enforceable even when contained in a non-executory contract. *See*

*Response* at ¶ 15, citing *General Motors Acceptance Corp. v. Rose (In re Rose)*, 21

B.R. 272, 276 (Bankr. D. N.J. 1982).[12] In contrast, CRF has cited recent case law in

---

[10] In relevant part, 11 U.S.C. § 365(e)(1) of the Bankruptcy Code provides:

> an executory contract or unexpired lease of the debtor may not be
> terminated or modified, and any right or obligation under such
> contract or lease may not be terminated or modified, at any time
> after the commencement of the case solely because of a provision
> in such contract or lease that is conditioned on . . . (B) the
> commencement of a case under this title.

[11] The term "executory contract" is not defined in the Bankruptcy Code. However, Professor Countryman's definition of an executory contract as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other" has been widely accepted in this and other Circuits. Vernon Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 MINN. L. REV. 439, 460 (1973); *see also COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373 (2d Cir. 2008).

[12] *Rose* is neither binding precedent nor strong authority. It relied on the legislative history of § 365 to support its argument that *ipso facto* clauses should be invalid for all purposes, but failed to explain why legislative history explaining a prohibition on *ipso facto* clauses in executory contracts and unexpired leases should apply to other types of contracts. *See In re Rose*, 21 B.R. at 276. Furthermore, § 365 represented a departure from the treatment of *ipso facto* clauses under the prior Bankruptcy Act, but

this Circuit upholding a right to post-petition default interest triggered solely by a debtor's bankruptcy filing. *See In re 20 Bayard Views LLC*, Case No. 09-50723 (Bankr. E.D.N.Y. Aug. 11, 2010);[13] *accord, Katzenstein v. VIII SV5556 (In re Saint Vincent's Catholic Med. Ctrs. of N.Y.)*, 440 B.R. 587, 601-02 (Bankr. S.D.N.Y. 2010). Although *ipso facto* clauses are unenforceable under certain circumstances not applicable here, such clauses are not *per se* invalid in the Second Circuit except where contained in an executory contract or unexpired lease.

There are situations in which courts have declined to enforce a bankruptcy default clause, such as where the clause may impede a debtor's ability to enjoy a "fresh start." *See, e.g., Riggs Nat'l Bank v. Perry*, 729 F.2d 982, 984 (4th Cir. 1984); *see generally*, William J. Burnett, *Prepetition Waivers of the Automatic Stay: Automatic Enforcement Equals Automatic Trouble*, 5 J. BANKR. L. AND PRAC. 257, 283 (Mar./Apr. 1996).[14] However, there are no such concerns in this case. GGP and

---

the Court failed to explain satisfactorily why Congress singled out only executory contracts and unexpired leases for special treatment under § 365(e)(1) when it could have spoken in broader terms. *See generally*, Richard H. Nowka, *Validating a Debtor's Retention of Collateral by Continuing Performance: Removing the Obstructions of 11 USC § 521(2)(A) and Ipso Facto Clauses*, 6 J. BANKR. L. AND PRAC. 145, 163-70 (Jan./Feb. 1997). *Rose* is also distinguishable on a factual basis from the case at bar because plaintiff's remedy in that case would have allowed the plaintiff to capture equity "over and above the remaining amount due" to plaintiff. *In re Rose*, 21 B.R. at 277. In the instant matter, CRF is not seeking the payment of any sums above and beyond those provided for in the Homart Note.

[13] In its Response, GGP also cites *In re Bownetree, LLC*, 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009) in support of its position and suggests that the Bankruptcy Court in that case denied enforcement of an *ipso facto* clause even though the contract at issue was not an executory contract. *See Response* at ¶ 18. However, *Bownetree* has been distinguished by a subsequent decision in the same district by a different Bankruptcy judge, *see In re 20 Bayard Views LLC*, Case No. 09-50723 (Bankr. E.D.N.Y. Aug. 11, 2010), and, contrary to the Debtors' position, in *20 Bayard Views*, the Court held, in a ruling from the bench, that the "language in Bownetree suggest that there the Court viewed the contract as an executory contract." *See* August 11, 2010, Trial Tr. at 23-24 (Dkt. No. 142). On that basis, the Court held that the *Bownetree* case was distinguishable because the contract at issue in *20 Bayard Views* had not been shown to be an executory contract. Having determined that the contract at issue there was not an executory contract, the Court upheld the relevant *ipso facto* clause. *Id*. at 24.

[14] The author there contends that *ipso facto* clauses are disfavored because they are typically negotiated on behalf of shareholders who do not bear the negative consequences of such clauses post-petition. Rather, in the usual case where the debtor is insolvent, it is the unsecured creditors who bear the cost

its affiliated debtors are highly solvent, GGP has confirmed a Plan, and it emerged from bankruptcy months ago. GGP's ability to exercise its right to file for bankruptcy was not impaired, nor was its ability to enjoy a fresh start. *See Century Bank at Broadway v. Peacock (In re Peacock)*, 87 B.R. 657, 659 (Bankr. D. Colo. 1988); *see Taylor v. Albany Emps. Federal Credit Union* (*In re Taylor*), 146 B.R. 41, 46–47 (M.D.Ga. 1992), *rev'd on other grounds,* 3 F.3d 1512 (11th Cir. 1993); *In re Saint Vincent's Catholic Med. Ctrs. of N.Y.*, 440 B.R. at 601-02 (enforcing an *ipso facto* clause that triggered the imposition of default interest).

Moreover, imposition of the Default Rate in this case is consistent with § 1123(d), even if not mandated by its terms.[15] *See* Grant T. Stein and Ralph S. Wheatly, *The Impact of Cure and Reinstatement on Default Interest,* 16 AM. BANKR. INST. J. 1, 33 (July/ Aug. 1997). If the interest rate here is determined strictly "in accordance with the underlying agreement and applicable nonbankruptcy law" as provided in § 1123(d), the Default Rate was triggered by GGP's Chapter 11 filing.

---

of a debtor's prior agreement to an *ipso facto* provision, and the debtor has "no particular incentive in negotiating loans to exclude such clauses, and other creditors may have no effective way of forcing the debtor to exclude them." *See*, Burnett, 5 J. BANKR. L. AND PRAC. at 283. Where, as here, the Debtor is solvent, it is the Debtor and equity who bear the burden of having agreed to the *ipso facto* provision in the first instance.

[15] The lead-in clause to § 1123(d) states that its application is "notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7) and 1129(b) of this title . . .." Section 365 is not referenced.

14

Case: 12-497    Document: 24    Page: 70    05/18/2012    614322    89

## CONCLUSION

For the reasons set forth above, CRF is entitled to post-petition interest on its claim at the contract default rate of 8.95% from the filing of GGP's bankruptcy petition through the Effective Date of the Plan. CRF should settle an order on 5 days' notice.


Dated: New York, New York
      June 16, 2011

                                     */s/ Allan L. Gropper*
                                     UNITED STATES BANKRUPTCY JUDGE

**SPA-16**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

.......................................................x
                                        :
In re:                                  :        Chapter 11
                                        :
GENERAL GROWTH PROPERTIES,              :        Case No.: 09-11977 (ALG)
INC., *et al.*                          :
                                        :        (Jointly Administered)
                                        :
                Reorganized Debtors.    :
                                        :
.......................................................x

## ORDER GRANTING DEFAULT
## INTEREST TO THE COMPTROLLER OF THE STATE OF
## NEW YORK AS TRUSTEE OF THE COMMON RETIREMENT FUND

Upon consideration of the objection (the "Cure Objection") [Dkt. No. 6121] of the

Comptroller of the State of New York, as Trustee of the Common Retirement Fund ("CRF") to

the cure amount in connection with CRF's claim as proposed by GGP Limited Partnership

("GGP," and together with its affiliated-debtor entities, the "Reorganized Debtors") under the

*Plan Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy*

*Code, as Modified* [Docket 6240] (the "Plan"); and upon consideration of the Debtors' response

(the "Response") [Dkt. No. 6529] to the Cure Objection; and upon consideration of CRF's reply

(the "Reply") [Dkt. No. 6712]; and upon consideration of the Debtors' supplemental statement

(the "Supplement") [Dkt. No. 6715] in connection with the Cure Objection; and upon

consideration of the stipulation of facts (the "Stipulation") [Dkt. No. 6728] in connection with

the Cure Objection; and the Court having jurisdiction to consider the Cure Objection and the

relief requested therein; and venue being proper before this Court; and the Court having heard

the arguments of counsel at the hearing on February 24, 2011 (the "Hearing") to consider the

Cure Objection; and based upon consideration of the Cure Objection, the Response, the Reply,

the Supplement, the Stipulation, the record of the Hearing, and all of the proceedings before the Court; and the Court having entered a Memorandum of Decision with respect to the Cure Objection on June 16, 2011, it is hereby

**ORDERED** that CRF's Cure Objection is upheld, and CRF's request for payment of pendency interest at the default rate from the petition date of April 16, 2009 through the Plan effective date of November 9, 2010 is granted; and it is further

**ORDERED** that, within or before three (3) business days following the entry of this Order, the Reorganized Debtors shall pay CRF by check or wire transfer pendency interest at the default interest rate in the amount of $11,683,815.00 (the "Default Interest Amount"); *provided, however,* the Reorganized Debtors shall retain their right to recover the Default Interest Amount from CRF to the extent this Order is reversed or modified on appeal by a final, non-appealable order and shall receive same from CRF within seven (7) business days of such final, non-appealable order, and CRF shall retain its rights, claims and defenses in connection therewith; it is further

**ORDERED** that the Court shall reserve jurisdiction to interpret and enforce this Order.

Dated: June 23, 2011
      New York, New York


                                  */s/ Allan L. Gropper*
                                  THE HONORABLE ALLAN L. GROPPER
                                  UNITED STATES BANKRUPTCY JUDGE

Case: 12-497    Document: 24    Page: 73    05/18/2012    614322    89

SPA-18

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (*admitted pro hac vice*)


Attorneys for Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                    :
**In re**                                            :          **Chapter 11**
                                                    :
**GENERAL GROWTH**                                   :
**PROPERTIES, INC.,** *et al.,*                     :          **Case No. 09-11977 (ALG)**
                                                    :
                        **Reorganized Debtors.**    :          **Jointly Administered**
                                                    :
------------------------------------------------------------x

<u>**NOTICE OF APPEAL**</u>

GGP Limited Partnership, as well as its reorganized debtor affiliates (collectively,

the "Reorganized Debtors") in the above captioned chapter 11 cases (collectively, the "Chapter

11 Cases"), appeal under 28 U.S.C. § 158(a) from the order of the bankruptcy judge entitled

*Order Granting Default Interest to the Comptroller of the State of New York as Trustee of the*

*Common Retirement Fund* (the "CRF Order") entered in the Chapter 11 Cases on the 23rd day of

June, 2011.

The names of all parties to the CRF Order and the names, addresses and telephone

numbers of their respective attorneys are as follows:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (admitted *pro hac vice*)

Attorneys for the Reorganized Debtors, Appellants

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500
Andrew C. Gold

Attorneys for The Comptroller of the State of
New York as Trustee of the Common Retirement Fund, Appellee

Dated: July 5, 2011

/s/ *Gary T. Holtzer*
Attorneys for Appellant

Marcia L. Goldstein
Gary T. Holtzer
Adam P. Strochak
Stephen A. Youngman (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

▷

**Effective: December 22, 2010**

United States Code Annotated <u>Currentness</u>
  Title 11. Bankruptcy <u>(Refs & Annos)</u>
    ⌐▣ <u>Chapter 3</u>. Case Administration <u>(Refs & Annos)</u>
     ⌐▣ <u>Subchapter IV</u>. Administrative Powers
      ➡➡ **§ 362. Automatic stay**

**(a)** Except as provided in subsection (b) of this section, a petition filed under <u>section 301</u>, <u>302</u>, or <u>303</u> of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

**(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

**(2)** the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

**(3)** any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

**(4)** any act to create, perfect, or enforce any lien against property of the estate;

**(5)** any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

**(6)** any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

**(7)** the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

**(8)** the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

**(b) [omitted]**

**(c) [omitted]**

**(d)** On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

**(1)** for cause, including the lack of adequate protection of an interest in property of such party in interest;

**(2)** with respect to a stay of an act against property under subsection (a) of this section, if--


SPA-21

**(A)** the debtor does not have an equity in such property; and

**(B)** such property is not necessary to an effective reorganization;

**(3)** with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--

**(A)** the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

**(B)** the debtor has commenced monthly payments that--

**(i)** may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

**(ii)** are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

**(4)** with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either--

**(A)** transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

**(B)** multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

**[remainder of statute omitted]**

Current through P.L. 112-104 (excluding P.L. 112-91, 112-95, 112-96, and 112-102) approved 4-2-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective: December 22, 2010**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 3. Case Administration (Refs & Annos)
         Subchapter IV. Administrative Powers
        ➔➔ § 363. Use, sale, or lease of property

**(a)** [omitted]

**(b)(1)** The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless--

   **(A)** such sale or such lease is consistent with such policy; or

   **(B)** after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease--

      **(i)** giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

      **(ii)** finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

**(2)** If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then--

   **(A)** notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

   **(B)** notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended--

      **(i)** pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

      **(ii)** pursuant to subsection (g)(2) of such section; or

      **(iii)** by the court after notice and a hearing.

Case: 12-497    Document: 24    Page: 78    05/18/2012    614322    89

SPA-23

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless--

    (A) each entity that has an interest in such cash collateral consents; or

    (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(3) Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

(4) Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

(d) [omitted]

(e) [omitted]

(f) [omitted]

(g) [omitted]

(h) [omitted]

(i) [omitted]

(j) [omitted]

(k) [omitted]

(l) Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

[remainder of statute omitted]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Current through P.L. 112-104 (excluding P.L. 112-91, 112-95, 112-96, and 112-102) approved 4-2-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

▷

**Effective:[See Notes]**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    🔖 Chapter 3. Case Administration (Refs & Annos)
      🔖 Subchapter IV. Administrative Powers
        ➡➡ **§ 365. Executory contracts and unexpired leases**

**(a)** Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

**(b)(1)** If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--

  **(A)** cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

  **(B)** compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

  **(C)** provides adequate assurance of future performance under such contract or lease.

**(2)** Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to--

  **(A)** the insolvency or financial condition of the debtor at any time before the closing of the case;

  **(B)** the commencement of a case under this title;

  **(C)** the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

  **(D)** the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

**(3)** For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance--

  **(A)** of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

**(B)** that any percentage rent due under such lease will not decline substantially;

**(C)** that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

**(D)** that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

**(4)** Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease.

**(c) [omitted]**

**(d) [omitted]**

**(e)(1)** Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on--

**(A)** the insolvency or financial condition of the debtor at any time before the closing of the case;

**(B)** the commencement of a case under this title; or

**(C)** the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

**(2)** Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--

**(A)(i)** applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

**(ii)** such party does not consent to such assumption or assignment; or

**(B)** such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

**[remainder of statute omitted]**

Current through P.L. 112-104 (excluding P.L. 112-91, 112-95, 112-96, and 112-102) approved 4-2-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


▷

**Effective: October 17, 2005**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
         Subchapter I. Creditors and Claims
         ➡➡ **§ 502. Allowance of claims or interests**

**(a)** A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

**(b)** Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that--

   **(1)** such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

   **(2)** such claim is for unmatured interest;

   **(3)** if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

   **(4)** if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

   **(5)** such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;

   **(6)** if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--

      **(A)** the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--

         **(i)** the date of the filing of the petition; and

         **(ii)** the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

      **(B)** any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

**(7)** if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds--

  **(A)** the compensation provided by such contract, without acceleration, for one year following the earlier of--

    **(i)** the date of the filing of the petition; or

    **(ii)** the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

  **(B)** any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

**(8)** such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

**(9)** proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726(a) of this title or under the Federal Rules of Bankruptcy Procedure, except that a claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide, and except that in a case under chapter 13, a claim of a governmental unit for a tax with respect to a return filed under section 1308 shall be timely if the claim is filed on or before the date that is 60 days after the date on which such return was filed as required.

**[remainder of statute omitted]**

Current through P.L. 112-104 (excluding P.L. 112-91, 112-95, 112-96, and 112-102) approved 4-2-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

C

**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
        Subchapter I. Creditors and Claims
          ➡➡ **§ 506. Determination of secured status**

**(a)(1)** An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

**(2)** If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

**(b)** To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

**(c)** The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

**(d)** To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--

   **(1)** such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

   **(2)** such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

Current through P.L. 112-104 (excluding P.L. 112-91, 112-95, 112-96, and 112-102) approved 4-2-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**SPA-30**

c

**Effective: December 22, 2010**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    ⌐▣ Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
      ⌐▣ Subchapter III. The Estate (Refs & Annos)
        ➛➛ § 541. Property of the estate

**(a)** The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

  **(1)** Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

  **(2)** All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is--

    **(A)** under the sole, equal, or joint management and control of the debtor; or

    **(B)** liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

  **(3)** Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

  **(4)** Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

  **(5)** Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date--

    **(A)** by bequest, devise, or inheritance;

    **(B)** as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or

    **(C)** as a beneficiary of a life insurance policy or of a death benefit plan.

  **(6)** Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

**(b) [omitted]**

**(c)(1)** Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law--

**(A)** that restricts or conditions transfer of such interest by the debtor; or

**(B)** that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

**(2)** A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

**[remainder of statute omitted]**

Current through P.L. 112-104 (excluding P.L. 112-91, 112-95, 112-96, and 112-102) approved 4-2-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

**Effective: October 17, 2005**

United States Code Annotated Currentness
    Title 11. Bankruptcy (Refs & Annos)
        ⌐▣ Chapter 11. Reorganization (Refs & Annos)
        ⌐▣ Subchapter II. The Plan (Refs & Annos)
            →→ § 1123. Contents of plan

**(a)** Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall--

**(1)** designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

**(2)** specify any class of claims or interests that is not impaired under the plan;

**(3)** specify the treatment of any class of claims or interests that is impaired under the plan;

**(4)** provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

**(5)** provide adequate means for the plan's implementation, such as--

**(A)** retention by the debtor of all or any part of the property of the estate;

**(B)** transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

**(C)** merger or consolidation of the debtor with one or more persons;

**(D)** sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

**(E)** satisfaction or modification of any lien;

**(F)** cancellation or modification of any indenture or similar instrument;

**(G)** curing or waiving of any default;

**(H)** extension of a maturity date or a change in an interest rate or other term of outstanding securities;

**(I)** amendment of the debtor's charter; or

**(J)** issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

**(6)** provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation re-

ferred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

**(7)** contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee; and

**(8)** in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

**(b)** Subject to subsection (a) of this section, a plan may--

**(1)** impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

**(2)** subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

**(3)** provide for--

**(A)** the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

**(B)** the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

**(4)** provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

**(5)** modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

**(6)** include any other appropriate provision not inconsistent with the applicable provisions of this title.

**(c)** In a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale, or lease.

**(d)** Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Current through P.L. 112-104 (excluding P.L. 112-91, 112-95, 112-96, and 112-102) approved 4-2-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**c**

**Effective: October 17, 2005**

United States Code Annotated <u>Currentness</u>
  Title 11. Bankruptcy <u>(Refs & Annos)</u>
    ⌐☒ <u>Chapter 11</u>. Reorganization <u>(Refs & Annos)</u>
      ⌐☒ <u>Subchapter II</u>. The Plan <u>(Refs & Annos)</u>
        ➡➡ **§ 1124. Impairment of claims or interests**

Except as provided in <u>section 1123(a)(4)</u> of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan--

  **(1)** leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

  **(2)** notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default--

    **(A)** cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in <u>section 365(b)(2)</u> of this title or of a kind that <u>section 365(b)(2)</u> expressly does not require to be cured;

    **(B)** reinstates the maturity of such claim or interest as such maturity existed before such default;

    **(C)** compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

    **(D)** if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to <u>section 365(b)(1)(A)</u>, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

    **(E)** does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Current through P.L. 112-104 (excluding P.L. 112-91, 112-95, 112-96, and 112-102) approved 4-2-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT